[Cite as *Fisher v. Beazer E., Inc.*, 2013-Ohio-5251.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 99662**

# JEANINE M. FISHER, EXECUTOR OF THE ESTATE OF JOSEPH BOHAZI, DECEASED

PLAINTIFF-APPELLEE
and CROSS-APPELLANT

vs.

# BEAZER EAST, INC., ET AL.

DEFENDANTS-APPELLANTS
and CROSS-APPELLEES

[APPEAL BY FERRO ENGINEERING DIVISION
OF MARINE SERVICES CO.]

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-701166

**BEFORE:** Kilbane, J., S. Gallagher, P.J., and Rocco, J.

**RELEASED AND JOURNALIZED:** November 27, 2013

**ATTORNEYS FOR APPELLANTS/CROSS-APPELLEES**

Stephen H. Daniels
James A. Byrne
Evan J. Palik
McMahon Degulis L.L.P.
812 Huron Road, E.
Suite 650
Cleveland, Ohio 44115

Dennis H. Markusson
950 17th Street
Suite 1050
Denver, Colorado 80202

**ATTORNEYS FOR APPELLEE/CROSS-APPELLANT**

Joseph J. Cirilano
Stephanie N. Bell
Diana Nickerson Jacobs
Charles J. McLeigh
Goldberg, Persky & White, P.C.
1030 Fifth Avenue, 3rd Floor
Pittsburgh, PA 15219

MARY EILEEN KILBANE, J.:

{¶1} This matter arises from a jury verdict for plaintiff, Jeanine M. Fisher ("Fisher"), daughter of Joseph Bohazi ("Bohazi") and executor of his estate, awarding damages for Bohazi's exposure to asbestos-containing materials and his death from malignant mesothelioma. The defendant, Ferro Engineering Division of Marine Services Co. ("Ferro"), appeals from the judgment of the trial court that denied its motions for a directed verdict and for judgment notwithstanding the verdict. The plaintiff cross-appeals from the jury's apportionment of liability among various entities, including Bohazi's former employers. For the reasons set forth below, we affirm the denial of the motion for a directed verdict and motion for judgment notwithstanding the verdict, and affirm the apportionment of liability.

{¶2} Following his graduation from high school in 1951, Joseph Bohazi began work at the Youngstown Sheet & Tube Company in Campbell, Ohio. He worked as an apprentice boilermaker until 1953, then served in the Marine Corps from 1953 to 1955. He resumed his boilermaker apprenticeship from 1955 until 1957, then worked as journeyman boilermaker from 1957 until his retirement in 1985. In 2009, Bohazi was diagnosed with mesothelioma.

{¶3} On August 10, 2009, Bohazi and his wife, Jane ("Jane"), filed this matter pursuant to the Standing Order Regarding Asbestos Personal Injury Complaints. The plaintiffs alleged asbestos-related personal injury and loss of consortium against 29

defendants.  They set forth claims for strict liability for defective design; strict liability for failure to warn; negligent design and distribution; negligent failure to warn; breach of warranty; conspiracy, concert of action, and common enterprise; liability for indivisible injury caused by asbestos products placed in the stream of commerce; and market-share liability.

{¶4}   Bohazi died on August 9, 2011.  Jane died the following year, and Fisher was substituted as the plaintiff herein.  By January 2013, the action remained pending only as to Ferro.  The matter proceeded to a jury trial on January 24, 2013.

{¶5}   The videotaped deposition of Bohazi established that he began work at Youngstown Sheet & Tube in 1951.  He worked as an apprentice boilermaker and advanced to journeyman.  In addition to boiler work, he performed structural ironwork on the furnaces at the plant.  He generally worked in the open hearth department. According to this testimony, he worked within sight of the platforms where molten steel was poured from the open hearth to the ladles.  Some of the ingot molds were lined with asbestos-containing  "hot tops."  The hot top remained on the mold as it cooled.  It then fell apart, or was removed in the stripper building that was about 50-60 feet away from where Bohazi worked.  Bohazi testified that this procedure generated dust.  There was also a breeze in the workplace caused by the heat from the ovens, and this "stirred up" the air.  Bohazi further testified that  dust was visible in his work area, and he inhaled this dust as a "matter of breathing in and out" while at work.  He was never required to wear a mask or any type of breathing protection from asbestos.  Bohazi stated that he spent the

great majority of his time around the steel pouring pits. Whenever the platforms of the pouring floors were damaged, he completed repairs in those areas. At other times, he worked on the ladles of the pouring floor, about 100 feet from the molds. In addition, the molds with the hot tops were frequently placed nearby for cooling.

{¶6} Richard Antal ("Antal"), testified that he worked as a boilermaker at Youngstown Sheet & Tube beginning in 1952. He stated that he and Bohazi worked "all over" the steel mill, including the open hearth and blast furnace. In the open hearth area, there were about 30 ladles pouring steel from the furnaces. Linings and hot tops for the molds were made of asbestos fiber. He recalled that they were Ferro products, and that Ferro boards were stored in the area. They were used in the molds, then disintegrated after use or were removed nearby by a crane operator. According to Antal, dust came from the boards and would float in the air, which he, Bohazi, and other workers inhaled. As to other products, Antal admitted on cross-examination that Owens-Corning Kaylo was also used as pipe insulation near Bohazi and other boilermakers.

{¶7} Les Allshouse ("Allshouse") testified that he worked at Youngstown Sheet & Tube for about 31 years, beginning in 1952. He worked in the open hearth department and stated that clay-lined Fosesco and Insul brand hot tops, and Ferro hot tops were used in this area. The hot tops generated debris as they were moved, and they also degraded after use or were crushed by a crane operator in the removal process.

{¶8} Samuel Mazilia ("Mazilia") also testified that he was a hot top crane operator at Youngstown Sheet & Tube from 1958 to 1979. He stated that Ferro

disposable hot tops, Ramset hot tops, and Insul brand hot tops were used in the open hearth department.

{¶9} John Tooey ("Tooey"), a former salesman for Ferro, testified that Ferro sold various products that contained asbestos, including Ferro hot top boards, rings, and covering compound. Tooey further testified that it was his practice to observe the products in use at the mill, and that when these products were shipped, installed, and used in production, they created dust. The products were installed using a type of pitchfork and this emitted dust. Later, after use, the hot tops were crushed and removed from the mold by crane. As much as a foot of residue fell from the mold and a cloud of dust would form and rise into the air. According to this witness, Ferro never provided information concerning the hazards of asbestos, even after the enactment of OSHA.

{¶10} William Gabriel ("Gabriel"), former assistant to the general manager of Ferro's Engineering Division, testified on cross-examination that Ferro had been the second largest manufacturer of hot tops. Until 1974, Ferro's hot top boards and covering compound contained asbestos, and Ferro board ingot liners contained 5-6 percent asbestos. Hot top covers were 20 percent asbestos by weight. During this period, Ferro received shipments of asbestos by 80,000 pound carloads for use in production.

{¶11} With regard to Ferro products used at Youngstown Sheet & Tube, Gabriel testified that invoices demonstrate that Ferro products containing asbestos were shipped to the open hearth department of the mill, including pallets of hot tops, over 2 million pounds of covering compound, and over 200,000 pounds of hot top veneer compound.

Gabriel stated that Ferro employees observed use of the product at the steel mills. He observed that after use, the product would leave a residue inside the ingot mold and a worker then vacuumed it away or removed it with compressed air, releasing dust into the air.

{¶12} Richard Hatfield ("Hatfield"), of Materials Analytic Services, testified that he has worked as a materials scientist dealing with asbestos. According to Hatfield, asbestos-containing materials can shed fibers, which then float in the air. Depending upon the length, the fiber may remain in the air before settling. General cleanup may clear the bulk of the fibers from the workplace, but even an area that appears clean may have residual fibers.

{¶13} On cross-examination, Hatfield admitted that he did not measure asbestos levels at the mill, and that workers situated 6-8 feet away from the product generally have potential fiber exposure reduced by 50 percent. Hatfield also admitted that he did not analyze any Ferro products. In addition, he conceded that Bohazi was exposed to asbestos during his time in the military where he worked on boilers at Camp Pendleton. Bohazi also applied Celotex asbestos-containing materials and Babcock & Wilcox asbestos-containing materials in the 1950s, 1960s, and 1970s. These were significant exposures according to Hatfield.

{¶14} Barry Castleman, Ph.D. ("Castleman"), a chemical engineer with a doctorate degree in occupational and environmental health, testified as an expert in the history of asbestos disease and industrial knowledge of asbestos hazards. Castleman stated that

awareness of the dangers of asbestos is traced to several papers published in medical journals in the 1930s. Several other papers from the late 1940s identified asbestos as a substance that causes lung cancer, and this was confirmed by an epidemiological study from the 1950s. In 1971, after mesothelioma was identified as an asbestos-related disease, OSHA published an emergency temporary standard for asbestos. Asbestos use tapered off in the early 1970s, and companies started providing warnings on their products by the late 1970s.

{¶15} Robert Swedarsky, M.D. ("Swedarsky"), a board certified surgical and clinical pathologist, testified that he reviewed tissue slides and a tissue pathology report from Bohazi's treatment at the Cleveland Clinic. According to Swedarsky, Bohazi had malignant mesothelioma, and this surrounded his heart and caused his death. Swedarsky further testified that a diagnosis of malignant mesothelioma is a "sentinel event" for asbestos exposure. The asbestos fibers may be serpentine or amphiboles, but both are carcinogenic. They may be trapped within the lung or carried to lymph nodes.

{¶16} Ferro moved for a directed verdict at the close of the plaintiff's case. The trial court denied the motion, and Ferro recalled Gabriel to testify for the defense. Gabriel testified that Ferro manufactured materials containing asbestos and materials that did not contain asbestos. The asbestos-containing materials were used along with brick and other non-asbestos products in the steel-making process, and were designed to be only in the open hearth and pouring platforms. No Ferro board was sold to the facility prior to 1966, but sales records indicate that Ferro sold asbestos-containing hot tops to

Youngstown Sheet & Tube until 1974. Gabriel admitted, however, that thousands of bags of raw asbestos were delivered to Ferro's manufacturing facility. By 1971, a two-by two-inch warning that "breathing asbestos dust may cause serious bodily harm" was placed on the products.

{¶17} Thereafter, in connection with its apportionment of liability claim, the defense presented Bohazi's responses to interrogatories that listed his work history and related asbestos exposures from 1951 to 1995.

{¶18} The defense renewed its motion for a directed verdict at the close of all of the evidence. The trial court denied this motion, and on January 30, 2013, the jury returned a verdict for plaintiff. The jury awarded $1.3 million for survivorship and $1.3 million to Bohazi's estate, and also concluded that Bohazi was exposed to asbestos that was released from Ferro products, and that this exposure was a substantial factor in the development of mesothelioma. Fifteen other entities were listed on the verdict sheet, including three of Bohazi's former employers. The jury determined that Ferro was 6 percent at fault, and the trial court apportioned liability accordingly and entered judgment against Ferro in the amount of $156,000. The plaintiff maintained, however, that it was improper for the jury to apportion fault among Bohazi's former employers and that the amount of fault that the jury attributed to this group, which was 34 percent, should be redistributed among the other entities found to be at fault. The trial court denied plaintiff's motion. Ferro now appeals and plaintiff cross-appeals.

I. Ferro's Appeal

**{¶19}** Ferro assigns the following interrelated errors for our review:

Assignment of Error One

The trial court erred in denying [Ferro's] Motion for a Directed Verdict.

Assignment of Error Two

The trial court erred in denying [Ferro's] Motion for Judgment Notwithstanding the Directed Verdict.

**{¶20}** We employ a de novo standard of review in evaluating a trial court's ruling on a motion for directed verdict or judgment notwithstanding the verdict. *Whitaker v. Kear*, 123 Ohio App.3d 413, 422, 704 N.E.2d 317 (4th Dist.1997); *Kanjuka v. MetroHealth Med. Ctr.*, 151 Ohio App.3d 183, 2002-Ohio-6803, 783 N.E.2d 920 (8th Dist.).

**{¶21}** Civ.R. 50 sets forth the standard for granting a motion for a directed verdict and a motion for JNOV:

(A) Motion for directed verdict.

\* \* \*

(4) When granted on the evidence. When a motion for directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to each party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

\* \* \*

(B) Motion for judgment notwithstanding the verdict. Whether or not a motion to direct a verdict has been made or overruled \* \* \* a party may move to have the verdict and any judgment entered thereon set aside and to

have judgment entered in accordance with his motion; or if a verdict was not returned, such party, * * * may move for judgment in accordance with his motion. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative.

**{¶22}** In *Posin v. A.B.C. Motor Court Hotel, Inc.*, 45 Ohio St.2d 271, 275, 344 N.E.2d 334 (1976), the Ohio Supreme Court stated:

The test to be applied by a trial court in ruling on a motion for judgment notwithstanding the verdict is the same test to be applied on a motion for a directed verdict. The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions.

**{¶23}** In *Horton v. Harwick Chem. Corp.*, 73 Ohio St.3d 679, 1995-Ohio-286, 653 N.E.2d 1196, paragraph one of the syllabus, the Ohio Supreme Court has held that "[f]or each defendant in a multidefendant asbestos case, the plaintiff has the burden of proving exposure to the defendant's product and that the product was a substantial factor in causing the plaintiff's injury." *See also* R.C. 2307.96.

**{¶24}** The substantial factor test is set forth in R.C. 2307.96(B) as follows:

In determining whether exposure to a particular defendant's asbestos was a substantial factor in causing the plaintiff's injury or loss, the trier of fact in the action shall consider, without limitation, all of the following:

(1) The manner in which the plaintiff was exposed to the defendant's asbestos;

(2) The proximity of the defendant's asbestos to the plaintiff when the exposure to the defendant's asbestos occurred;

(3) The frequency and length of the plaintiff's exposure to the defendant's asbestos;

(4) Any factors that mitigated or enhanced the plaintiff's exposure to asbestos.

See also *Whipkey v. Aqua-Chem, Inc.*, 8th Dist. Cuyahoga No. 96672, 2012-Ohio-918.

**{¶25}** Ferro argues that Bohazi did not work near the hot tops and that there was insufficient evidence that his exposure to asbestos fibers from Ferro was a substantial factor in the development of his mesothelioma.

**{¶26}** The overwhelming evidence of record indicates, however, that Ferro sold a large quantity of products containing approximately 20 percent asbestos to the facility where Bohazi worked. These products were inherently dusty and generated significant amounts of dust during use. After that use, the products deteriorated or were removed in a process that generated substantial amounts of dust and residue. In addition, the cleaning of the molds generated additional dust. The evidence of record also demonstrated that asbestos fibers remain embedded in the lungs, that asbestos exposures accumulate in the lungs over time, and that mesothelioma results from asbestos exposure.

**{¶27}** The evidence presented by plaintiff also demonstrated Bohazi had frequent and prolonged exposure to dust generated by Ferro's products. During his many years as a boilermaker, Bohazi was in close enough proximity to inhale and did inhale asbestos fibers from Ferro's products, and he was never required to wear a mask or any type of breathing protection to mitigate the exposure to the asbestos-containing dust. The

evidence of record demonstrates that Bohazi worked near the open hearth area where the hot tops were used and removed by cranes. This process generated residue and dust in the air that he and others inhaled on a regular basis. The testimony of Tooey also established that he observed the use of Ferro products and that when these products were shipped, installed at a mill, and used in production they created dust. After use, the hot tops were removed from the mold by cranes and crushed, and as much as a foot of residue fell from the mold. The evidence established that a cloud of dust would form from the hot tops and rise into the air that workers inhaled while working nearby. Further, there is no dispute that Bohazi developed mesothelioma, which according to plaintiff's medical evidence is a condition that is a "sentinel event for asbestos exposure."

{¶28} Viewing the evidence most strongly in favor of plaintiff, as we must, we conclude that the trial court properly denied the motions for a directed verdict and for judgment notwithstanding the verdict. In accordance with the foregoing, plaintiff met her burden of proving exposure to the defendant's product and that the product was a substantial factor in causing the plaintiff's injury. The motions for a directed verdict and judgment notwithstanding the verdict were without merit, and the trial court properly denied these motions.

{¶29} Ferro's assignments of error are without merit.

II. Plaintiff's Cross-Appeal

{¶30} Plaintiff assigns the following sole assignment of error for our review:

The trial court erred in denying [plaintiff's] objection and permitting [plaintiff's] decedent's former employers to be listed on the verdict slip of the trial of this action.

**{¶31}** Herein, plaintiff argues that because the Worker's Compensation Act extends to employers immunity from suit for injuries suffered by employees in the workplace, the trial court erred in including Bohazi's three former employers in its apportionment of liability. In opposition, Ferro insists that employers and others from whom a plaintiff is not seeking recovery must still be included in the apportionment calculations as "empty chair" parties under R.C. 2307.23.

**{¶32}** R.C. 2307.22 provides, in relevant part as follows:

(A) Subject to [enumerated exceptions] joint and several tort liability shall be determined as follows:

(1) In a tort action in which the trier of fact determines that two or more persons proximately caused the same injury or loss to person or property or the same wrongful death and in which the trier of fact determines that more than fifty percent of the tortious conduct is attributable to one defendant, that defendant shall be jointly and severally liable in tort for all compensatory damages that represent economic loss.

(2) If division (A)(1) of this section is applicable, each defendant who is determined by the trier of fact to be legally responsible for the same injury or loss to person or property or the same wrongful death and to whom fifty per cent or less of the tortious conduct is attributable shall be liable to the plaintiff only for that defendant's proportionate share of the compensatory damages that represent economic loss.  * * *

**{¶33}** The term "tort action" includes asbestos claims under R.C. 2307.91. *See* R.C. 2307.011(J).

**{¶34}** R.C. 2307.23 sets forth the requirements when determining percentage of tortious conduct attributable to a party and provides as follows:

(A) In determining the percentage of tortious conduct attributable to a party in a tort action * * *   the jury in a jury action shall return a general verdict accompanied by answers to interrogatories, that shall specify all of the following:

(1) The percentage of tortious conduct that proximately caused the injury or loss to person or property or the wrongful death that is attributable to the plaintiff and to each party to the tort action from whom the plaintiff seeks recovery in this action;

(2) The percentage of tortious conduct that proximately caused the injury or loss to person or property or the wrongful death that is attributable to each person from whom the plaintiff does not seek recovery in this action.

(B) The sum of the percentages of tortious conduct as determined pursuant to section (A) of this section shall equal one hundred percent.

(C) For purposes of division (A)(2) of this section, it is an affirmative defense for each party to the tort action from whom the plaintiff seeks recovery in this action that a specific percentage of the tortious conduct that proximately caused the injury or loss to person or property or the wrongful death is attributable to one or more persons from whom the plaintiff does not seek recovery in this action.   * * *.

**{¶35}** Pursuant to R.C. 2307.011(J), "Persons from whom the plaintiff does not seek recovery in this action" includes, but is not limited to, the following:

(1) Persons who have entered into a settlement agreement with the plaintiff;

(2) Persons whom the plaintiff has dismissed from the tort action without prejudice;

(3) Persons whom the plaintiff has dismissed from the tort action with prejudice;

(4) Persons who are not a party to the tort action whether or not that person was or could have been a party to the tort action if the name of the person has been disclosed prior to trial.

**{¶36}** In enacting R.C. 2307.22, the Ohio legislature established that in a tort action where more than one tortfeasor has proximately caused a person's property damage, any tortfeasor who has caused 50 percent or less of the tortious conduct is responsible for only his or her proportional share of the economic loss. *Gurry v. C.P.*, 8th Dist. Cuyahoga No. 97815, 2012-Ohio-2640; R.C. 2307.22(A)(2). The defense retains the right to assert that another potential tortfeasor contributed to the alleged damages. R.C. 2307.23. The statute provides for the apportionment of fault to others, including persons or entities not present at the time of trial. *See Kritzwiser v. Bonetzky*, 3d Dist. Logan No. 8-07-24, 2008-Ohio-4952.

**{¶37}** Significantly, R.C. 2307.23 does not exclude employer negligence from the apportionment. Nor does it exclude any party who may be entitled to immunity or who otherwise could not be made a party. Rather, under the express language of R.C. 2307.011(J), "[p]ersons from whom the plaintiff does not seek recovery in this action" includes "[p]ersons who are not a party to the tort action whether or not that person was or could have been a party."

**{¶38}** R.C. 2307.23 requires only that a defendant raise the "empty chair" as an affirmative defense, present evidence regarding contributory fault, and submit proposed jury instructions or interrogatories to the trial court regarding the liability of others. *See*

*Bonetzky* at ¶ 22. In short, R.C. 2307.23 requires a jury to consider the percentage of tortious conduct attributable to each person who proximately caused the injury or loss, regardless of whether the plaintiff is seeking recovery or is able to seek recovery from that person. Workers' compensation immunity, on the other hand, provides that "[e]mployers who comply with section 4123.35 of the Revised Code shall not be liable to respond in damages[.]" Ohio Constitution, Article II, Section 35; R.C. 4123.74; R.C. 4123.741.

{¶39} In accordance with the foregoing, we conclude that the trial court properly included Bohazi's former employers within the "empty chair" entities listed for jury apportionment of liability.

{¶40} The judgment is affirmed.

It is ordered that appellee recover from appellants costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY EILEEN KILBANE, JUDGE

SEAN C. GALLAGHER, P.J., and
KENNETH A. ROCCO, J., CONCUR