[Cite as *Westfield Ins. Co. v. Chapel Elec. Co., L.L.C.*, 2024-Ohio-2736.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| WESTFIELD INSURANCE | : | |
| Appellee | : | C.A. No. 29956 |
| | : | |
| v. | : | Trial Court Case No. 2019 CV 04160 |
| | : | |
| CHAPEL ELECTRIC CO. LLC et al. | : | (Civil Appeal from Common Pleas Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on July 19, 2024

. . . . . . . . . . .

EDWARD J. DOWD, CHRISTOPHER T. HERMAN and JAMES D. UTRECHT, Attorneys for Appellee

MARK C. ENGLING, Attorney for Appellant

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Appellant, Kastle Electric Co., nka TDG&P, Inc. ("Kastle"), appeals from a judgment awarded to Appellee, Westfield Insurance Company ("Westfield"), for contribution toward a settlement Westfield had paid to settle a wrongful death action.

After hearing the evidence, the jury found Kastle liable for 40% of the damages and awarded Westfield $2,400,000.

{¶ 2} Kastle asserts six assignments of error relating to pre-trial, trial, and post-trial issues, including the trial court's failure to award Kastle summary judgment on various issues, the court's admission of alleged hearsay testimony during trial, and the court's denial of motions for a directed verdict, for judgment notwithstanding the verdict, and for a new trial.   In addition, Kastle contends the jury verdict was against the manifest weight of the evidence.

{¶ 3} For the reasons discussed below, we conclude that Kastle's assignments of error lack merit.   Consequently, the judgment of the trial court will be affirmed.


I.   Facts and Course of Proceedings

{¶ 4} This action arose from Westfield's payment of $6,000,000 to settle wrongful death and survival claims based on the electrocution of Geoffrey Garnett on October 16, 2014, while he was performing repairs on the premises of Metal Shredders, Inc. ("Shredders").   According to the complaint filed in that action, Garnett's wife, Heather, filed suit against Shredders and Cohen Brothers, Inc. ("Cohen"), who were Westfield's insureds.   Westfield later settled the suit and paid the settlement amount following probate court approval.

{¶ 5} On September 12, 2019, Westfield filed the current suit for contribution against Kastle, its successor-in-interest Chapel-Romanoff Technologies & Chapel Electric ("Chapel"), Jason Hardin, Manuel Herald, and Samuel Luttrell (Kastle

employees), and John Does 1 through 20. The complaint alleged that Kastle's employees had been called to Shredders to perform repairs on electric issues. Allegedly, these employees negligently left the equipment in a hazardous condition, failed to make proper repairs, and failed to provide adequate warnings, which resulted in Garnett's death.

{¶ 6} After Chapel filed a motion for judgment on the pleadings (based on the fact that it was not a successor), Westfield filed an amended complaint on October 16, 2019, adding TDG&P, Inc. ("TDG&P") and Kastle Acquisition, LLC ("Acquisition") as parties. The allegations in the amended complaint were the same, other than alleging that TDG&P, Kastle, and Acquisition were alter egos or successors of one or more of the defendants named in the original complaint and were liable. The amended complaint further added that Westfield had paid the consideration for the wrongful death settlement on December 6, 2018. Chapel then filed a motion for judgment on the pleadings in the amended complaint.

{¶ 7} On November 8, 2019, Kastle, TDG&P, Hardin, Herald, and Luttrell filed an answer to the amended complaint and raised various defenses, including the statute of limitations. On August 12, 2020, Westfield dismissed Chapel only without prejudice; a few days later, the court overruled Chapel's motion for judgment on the pleadings as moot. Then, on August 18, 2020, Westfield dismissed the claims against Acquisition without prejudice.

{¶ 8} The court continued the trial several times, until it was ultimately held in September 2023. In the meantime, the remaining defendants (collectively "Kastle") filed

a summary judgment motion on February 14, 2022. This motion was based on various grounds, including the facts that Westfield was not entitled to indemnification, that Kastle was not a joint tortfeasor, that Kastle had owed no duty to protect Garnett, and that the work Kastle had performed 10 months before Garnett's death did not cause or contribute to the death. Kastle attached various documents from the underlying action (*Garnett v. Metal Shredders, Inc.*, Montgomery C.P. No. 2016 CV 05284), as well as other materials, to this motion. Westfield responded to the motion on March 11, 2022 (with a memorandum as well as an amended memorandum), and Kastle replied on March 18, 2022. Before Westfield filed its response, it had dismissed Kastle's employees without prejudice.

{¶ 9} The trial court then granted in part and overruled in part Kastle's summary judgment motion. Decision, Order and Entry Granting in Part and Overruling in Part Defendants' Motion for Summary Judgment ("SJ Decision") (Apr. 19, 2022). The court agreed that Westfield did not have an indemnification claim, but it found that material issues of fact existed concerning whether Kastle's actions had been a proximate cause of Garnett's death and whether Kastle was liable as a joint tortfeasor. *Id.* at p. 8-9 and 12-13. Subsequently, in June 2023, Kastle filed another summary judgment motion asserting that Westfield's claim was time-barred; Westfield responded in July 2023. The court denied this summary judgment motion in August 2023. *See* Decision and Entry Overruling Defendant, Kastle Electric Co., Now Known as TDG&P, Inc.'s Motion for Summary Judgment ("Limitations Decision") (Aug. 4, 2023).

{¶ 10} A jury trial was held in September 2023. After hearing the evidence, the

jury found Shredders 60% liable and Kastle 40% liable for Garnett's death. The jury further found $1,700,000 in economic damages and $4,300,000 in non-economic damages. In addition, the jury concluded that Westfield's $6,000,000 payment was reasonable and that Kastle should pay $2,400,000 as its share. Kastle then filed a notice of appeal from the judgment and also filed a motion for judgment notwithstanding the verdict ("JNOV") or for a new trial. In addition, Westfield filed a motion for prejudgment interest. After we remanded the case for resolution of the post-judgment motions, the trial court filed a decision on January 5, 2024, denying Kastle's motion. At that point, we allowed Kastle to amend its notice of appeal to include denial of the JNOV or new trial motion. In support of its appeal, Kastle has raised six assignments of error, which we will address in order.

## II.  Statute of Limitations

**{¶ 11}** Kastle's first assignment of error states that:

The Trial Court Erred in Failing to Grant Kastle Summary Judgment as to Westfield's Contribution Claim Where Such Claim Was Filed Outside the One-Year Limitations Period in R.C. 2307.26(B).

**{¶ 12}** Kastle contends that Westfield's contribution claim was barred because it failed to file the current lawsuit within one year after accepting the Garnett estate's demand of $6,000,000.[1] According to Kastle, the applicable statute of limitations was unambiguous, and the trial court erred by adding conditions to the statutory requirements.

---

[1] When we refer to the Garnett estate, we are using a shorthand means of referring to the claims brought by Heather Garnett, as a representative of the estate.

Thus, Kastle argues the trial court erred in denying summary judgment.

{¶ 13} As a preliminary point, "[a] trial court's denial of a motion for summary judgment is reviewable on appeal by the movant from a subsequent adverse final judgment." *Balson v. Dodds*, 62 Ohio St.2d 287 (1980), paragraph one of the syllabus. However, while this is true where purely legal questions of law are involved, it does not apply where trial evidence reveals genuine issues of material fact and the jury finds liability on the part of the party that requested summary judgment. *Becker v. Direct Energy, LP*, 2018-Ohio-4134, ¶ 36 (2d Dist.), citing *Continental Ins. Co. v. Whittington*, 71 Ohio St.3d 150, 155-156 (1994).

{¶ 14} Because Kastle is asserting legal issues about statutory language, we can review the trial court's denial of summary judgment. We also apply de novo review for statutory interpretation because it involves questions of law. *E.g., Bur. of Workers' Comp. v. Verlinger*, 2018-Ohio-1481, ¶ 6. In this type of review, we do not defer to the trial court's decision. *Hornbeck v. Hornbeck*, 2019-Ohio-2035, ¶ 13 (2d Dist.).

{¶ 15} The underlying case that the Garnett estate brought against Shredders, Cohen, and Shredders' employee (Luke Huggins) did not result in a judgment; instead, Westfield settled the case. Its right to contribution was established under R.C. 2307.25(C), which states: "A liability insurer that by payment has discharged in full or in part the liability of a tortfeasor and has discharged in full by the payment its obligation as insurer is subrogated to the tortfeasor's right of contribution to the extent of the amount it has paid in excess of the tortfeasor's proportionate share of the common liability."

{¶ 16} As relevant to that situation, R.C. 2307.26 further provides that:

If there is no judgment for the injury or loss to person or property or the wrongful death against the tortfeasor seeking contribution, that tortfeasor's right of contribution is barred unless . . .

. . .

(B) That tortfeasor has agreed while an action is pending against that tortfeasor to discharge the common liability and has paid within one year after the agreement the common liability and commenced that tortfeasor's action for contribution.

{¶ 17} Consequently, the following actions must take place: (1) the tortfeasor must agree to discharge common liability; (2) the tortfeasor must pay within one year after the agreement; and (3) the tortfeasor must commence a contribution action within one year after the agreement. Again, a subrogated insurer steps into the shoes of the insured tortfeasor on whose behalf it has paid.

{¶ 18} According to Kastle, Westfield accepted the estate's settlement offer in July 2018 but failed to file its contribution action until September 12, 2019, more than a year later. Kastle Brief, p. 12. In contrast, Westfield argues that the only agreed-upon term in July 2018 was the $6,000,000 amount. At that point, probate court approval was needed and negotiations continued to occur concerning the structure of the settlement and release documents (with draft releases and structure documents generated and exchanged between the end of July and the end of September 2018). In addition, the estate did not file a probate court application until after the latter time, and following probate court approval on December 6, 2018, Westfield issued a check and sent it to the

attorneys for the estate that day.   *See* Plaintiff's Exs. 10 and 31.   The final dismissal with prejudice of the underlying wrongful death lawsuit then occurred on December 17, 2018. Westfield, therefore, contended in the trial court and also claims here that the contribution lawsuit was timely filed.   *See* Westfield's July 10, 2023 Summary Judgment Response, p. 1-2 and 5-7, and Westfield Appellate Brief, p. 9-11.

{¶ 19} The trial court agreed with Westfield and denied summary judgment. Limitations Decision, p. 7.   The court stated that it had interpreted "the facts to find the parties had not made a contract by July 23, 2018 because there was a lack of certainty and definiteness," which "was not met until December 2018."   *Id.*

{¶ 20} Kastle contends the contribution statue is unambiguous.   When interpreting statutes, the primary concern is legislative intent.   *Bailey v. Republic Engineered Steels, Inc.*, 91 Ohio St.3d 38, 39 (2001).   To decide this, courts first consider a statute's language and its purpose.   If the statute's meaning "is unambiguous and definite, it must be applied as written and no further interpretation is necessary."   *State ex rel. Savarese v. Buckeye Local School Dist. Bd. of Edn.*, 74 Ohio St.3d 543, 545 (1996).   On the other hand, if ambiguity exists, interpretation is needed.   *Bailey* at 40.

{¶ 21} "When a statute is susceptible of more than one interpretation, courts seek to interpret the statutory provision in a manner that most readily furthers the legislative purpose as reflected in the wording used in the legislation."   *State ex rel. Toledo Edison Co. v. Clyde*, 76 Ohio St.3d 508, 513 (1996).   In this process, courts consider various factors, which include circumstances surrounding the statute's enactment, legislative history, the statute's history, common law or former statutes, similar statues, and a

particular construction's effect. *Id.* at 514; R.C. 149. Furthermore, where uniform statues are involved, Ohio courts may look to see how they are interpreted in other states. *Heitmeyer v. Arthur*, 2022-Ohio-4230, ¶ 19, fn. 3 (3d Dist.); *Ohio Ins. Guar. Assn. v. Simpson*, 1 Ohio App.3d 112, 113 (10th Dist.1981).

{¶ 22} Concerning its claim that the statute is unambiguous, Kastle relies on the common meaning of the word "agree," which essentially means to concur or consent. Kastle Brief at p. 12. In our opinion, that approach is too simplistic. The long-standing and general rule has been "that the right to contribution is inchoate from the time of the creation of the relationship giving rise to the common burden until the payment by a co-obligor of more than his proportional share, and that the right becomes complete and enforceable only upon a payment by the claimant extinguishing the whole of the common obligation. That is, even though the equity for contribution arises at the time of the creation of the relationship between the parties, the right to sue thereon accrues when a party has paid more than his share of the joint obligation." *Natl. Mut. Ins. Co. v. Whitmer*, 70 Ohio St.2d 149, 152 (1982), citing *Camp v. Bostwick*, 20 Ohio St. 337 (1870), paragraph five of the syllabus. (Other citations omitted.)

{¶ 23} Thus, the critical emphasis is on payment, not when a party may or may not have entered into an agreement. Furthermore, R.C. 2307.26(B) does not define "agreed" or "agreement," and we find these terms ambiguous in the context of this particular statute. As will be discussed below, personal representatives must obtain probate court approval in order to settle wrongful death actions. *See* R.C. 2125.02(E). In contrast, parties may settle other types of claims without such approval. However,

R.C. 2307.26(B) fails to account for these differences, and resorting to other means of statutory interpretation, including how other jurisdictions treat this uniform law, is appropriate.

{¶ 24} Before the Ohio Uniform Contribution Among Tortfeasors Act ("Ohio Act") became effective in October 1976, Ohio did not allow contribution or indemnification among joint or concurrent tortfeasors. *Whitmer* at 151 and fn. 3; *Travelers Indemn. Co. v. Trowbridge*, 41 Ohio St.2d 11, 14 (1975). Ohio's contribution scheme, as originally enacted in former R.C. 2307.31 et seq., was an " 'all but verbatim copy' of the Uniform Contribution Among Tortfeasors Act adopted in many other jurisdictions." *Smith v. Withrow*, 1991 WL 278258, *2 (12th Dist. Dec. 30, 1991), quoting Browne, *Contribution Among Tortfeasors: A Comment on Amended Ohio House Bill 531*, 25 Cleve.St.L.Rev. 151, 152 (1976). *See also Beck v. Cianchetti*, 1 Ohio St.3d 231, 234, fn. 3 (1982) (noting Ohio Act was modeled after the Uniform Contribution Among Tortfeasors Act ["Uniform Act"]).

{¶ 25} Section 3(d) of the Uniform Act states that:

> If there is no judgment for the injury or wrongful death against the tortfeasor seeking contribution, his right of contribution is barred unless he has either (1) discharged by payment the common liability within the statute of limitations period applicable to claimant's right of action against him and has commenced his action for contribution within one year after payment, or (2) agreed while action is pending against him to discharge the common liability and has within one year after the agreement paid the liability and

commenced his action for contribution.

Uniform Act, Enforcement, § 3(d) (1955).

{¶ 26} Ohio's provision comparable to §3(d) was originally codified as R.C. 2307.32(C). *See Walsh v. Jellen*, 51 Ohio Misc. 97, 100 (C.P. 1977), discussing Am.H.B. 531, which was effective in October 1976. This statute has since been amended a number of times, but its wording has remained consistent with only minor, non-substantive changes. *E.g.*, 1987 H. 1, eff. Jan. 1, 1988; S.B. 108, 2001 Ohio Laws 26, eff. July 6, 2001. In 2002, the General Assembly repealed R.C. 2307.32(C) and enacted R.C. 2307.26(B) in its place. *See* S.B. 120, 2002 Ohio Laws 240, eff. Apr. 9, 2003. Again, the relevant wording remained the same.

{¶ 27} We have been unable to find any Ohio cases specifically discussing the meaning of the terms "agree" and "agreement" in the context of either former R.C. 2307.32(C) or R.C. 2307.26(B). For example, while we mentioned former R.C. 2307.32(C) in *Good v. Lemcon Dev., Inc.*, 1992 WL 28160 (2d Dist. Feb. 24, 1992), the parties claiming contribution in that case admitted that they had paid the claim more than a year before filing suit. *Id.* at *1-2. Therefore, we did not consider the statute's meaning.

{¶ 28} In *Transcontinental Ins. Co. v. Wilford*, 2001 WL 1685584 (8th Dist. Dec. 20, 2001), the court did not discuss the meaning of the terms in the statute but did consider three different dates in deciding if a contribution claim was barred. These dates were: (1) May 10, 1999 (when the trial court dismissed the plaintiff's complaint against the tortfeasors with prejudice); (2) May 27, 1999 (when the insurance company

(Transcontinental) paid the plaintiffs and obtained a signed release); and (3) June 8, 1999 (when Transcontinental's insureds dismissed their cross claims against a third tortfeasor). Following these events, Transcontinental filed its contribution complaint against the third tortfeasor on June 5, 2000.   *Id.* at *1.   As a result, the action was filed more than a year after the first two dates, but not the third.

{¶ 29} The appellate court's discussion is a bit confusing, as the court first noted that the May 10 entry dismissing the plaintiffs' claims with prejudice (which it termed the "official entry") triggered the statute of limitations.   *Id.* at *2.   The court then rejected the June 8 dismissal as it was only "supplementary" to the May 10 dismissal.   *Id.*   Finally, the court stated that the May 27 settlement date also triggered the statute of limitations and that under either option (May 10 or May 27), the contribution claim was barred.   *Id.*

{¶ 30} Ultimately, the court remarked that (former) "R.C. 2307.32(C) contemplates that the one-year statute of limitations starts to run after payment of the claim by the tortfeasor seeking contribution before that tortfeasor may seek contribution. Accordingly, Transcontinental was required to file for contribution no later than May 27, 2000.   The record shows, and Transcontinental acknowledges that it filed its complaint for contribution on June 5, 2000, nine days after the statute of limitations expired."   *Id.* The court of appeals, therefore, affirmed the judgment dismissing the insurer's claim.

{¶ 31} Other than the above brief statements, there was no discussion of the court's reasoning or the statutory terms in former R.C. 2307.32(C).   However, if we applied the structure outlined in *Transcontinental*, Westfield's contribution complaint would be timely, as it paid the claim on December 6, 2018, and the wrongful death action

was dismissed on December 17, 2018. Westfield filed the contribution suit on September 12, 2019, which was less than a year after both dates.

**{¶ 32}** As noted, however, Kastle argues that the one-year time limit should run from July 2018, when Westfield accepted the Garnett estate's $6,000,000 demand. In contrast, Westfield has cited a Michigan case which it claims is directly on point here. *See* Westfield Brief at p. 9-10, discussing *New Hampshire Ins. Co. v. Charlevoix Cty. Rd. Comm.,* 193 Mich.App. 613 (1992). Michigan's statute contains the same wording as Ohio's statute, i.e., in situations where no judgment exists, a tortfeasor's contribution claim is barred "unless he has agreed while action is pending against him to discharge the common liability and has, within 1 year after the agreement, paid the liability and commenced his action for contribution." Mich.Comp.Laws Ann. 600.2925c(4).

**{¶ 33}** In *Charlevoix,* three dates were involved: (1) March 23, 1988 (when the court approved the wrongful death settlement and distribution of the proceeds); (2) May 5, 1988 (when the parties signed the settlement agreement); and May 1, 1989 (when the insurer filed its contribution lawsuit). *Id.* at 615. In looking at the situation, the court of appeals found that the agreement was made on March 23, 1988, when the court entry was filed. *Id.* at 618. The court also remarked that as early as January 12, 1988, the injured party had agreed to execute a release and to provide the insurer with its right to contribution. *Id.* The court then focused on whether the parties had come to a meeting of the minds sufficient to make the agreement enforceable by March 23, 1988, even though the parties did not execute a formal agreement until May 5, 1988. In this regard, the court remarked that:

The motion and order approving the settlement asserted that a settlement had been negotiated between the parties. In fact, the motion made reference to proceeds from a contribution claim. Plaintiff admitted that there was an enforceable agreement to pay the funds. It is doubtful that it would claim that there was not an enforceable agreement for the release of liability if [the injured party] had accepted the money and sued the other tortfeasors before May 5, 1988.

*Charlevoix* at 618. The court therefore held that the insurer had failed to file its contribution action within the required one-year period, and the action was barred. *Id.*

{¶ 34} Westfield contends that, consistent with *Charlevoix*, negotiations were ongoing at least through the end of September 2018, and that no valid settlement occurred prior to probate court approval on December 6, 2018. Westfield Brief at p. 9-11. Kastle's reply brief did not discuss *Charlevoix*. Instead, Kastle argued, as it had before, that R.C. 2307.26(B) is unambiguous. Kastle Reply Brief, p. 1-2.

{¶ 35} In order to consider this point, we researched nationwide contribution statutes and cases involving limitation of actions for contribution claims. Michigan is not the only state that has a statute like R.C. 2307.26(B). Legislation in similar states includes: Ariz.Rev.Stat.Ann. 12-2503(D.)(2.); Colo.Rev.Stat.Ann. 13-50.5-104(4); Conn.Gen.Stat.Ann. 52-572o(e)(2); Fla.Stat.Ann. 768.31(4)(d)(2); Iowa Code Ann. 668.6(3)(b); Mass.Gen.Laws Ann., Ch. 231B, section 3(d)(2); Nev.Rev.Stat.Ann. 17.285(4)(b); N.H.Rev.Stat.Ann. 507:7-gIII; N.C.Gen.Stat.Ann. 1B-3(d); N.D.Cent.Code Ann. 32-38-03(4); S.C.Code Ann. 15-38-40(D)(2); Tenn.Code Ann. 29-11-104(d)(2);

Or.Rev.Stat.Ann. 31.810(4)(b); and Wash.Rev.Code Ann. 4.22.050(3).

{¶ 36} Some states have uniform contribution laws but differ from Ohio. *E.g.,* Md.Code Ann., Cts. & Jud.Proc. 3-1402 and 3-1405; 42 Pa.C.S. 8321-8327. As an example, R.I.Gen.Laws Ann. 10-6-4 provides (with exceptions not relevant here) that "a joint tortfeasor is not entitled to a final money judgment for contribution until he or she has by payment discharged the common liability or has paid more than his or her pro rata share of the final money judgment. Actions for contribution shall be commenced not later than one year next after the first payment made by a joint tortfeasor which has discharged the common liability or is more than his or her pro rata share thereof."

{¶ 37} Case law from other states on the relevant issue is extremely sparse. However, we located a Florida decision that is very similar to the case before us. As here, the underlying action was for wrongful death, and several alleged tortfeasors were sued. *See Columbia Cty. Sheriff's Office v. Florida Dept. of Law Enforcement,* 574 So.2d 234, 235 (Fla.App.1991). During a September 6, 1983 telephone conference, an attorney for the Columbia County Sheriff's Office and its insurer agreed with the estate's counsel to pay the policy limits to settle the wrongful death suit and to release the estate's claims against the Sheriff, its insurer, another alleged tortfeasor who was not party to that suit, and others. This resulted from the estate's demand for policy limits, along with a September 6 deadline for responding. *Id.* at 235-236.

{¶ 38} This is exactly what occurred here. The Garnett estate's action was filed against Westfield's insureds (Cohen, Shredders, and Shredders' employee, Huggins), in October 2016. Kastle and its employees were not included in the suit. The claim was

initially assigned to a field representative and then to Glenn Scheuer, who had been employed by Westfield for more than 26 years. Scheuer was a complex claims specialist at the time and was later promoted to unit leader for the complex claims unit. Transcript of Proceedings ("Tr."), 359-360, and 369. After a mediation, an adverse court decision on Shredders' immunity claim, and a bad faith threat from its insureds, Scheuer received a $6,000,000 demand, which was within Westfield's policy limits. *Id.* at 384-386,388-389, 397, and 446. The plaintiff's attorney set a time limit for responding, and Westfield accepted the offer on that date. *Id.* at 463-465; Glenn Scheuer Deposition, VolII_K, p. 7 (also designated as Kastle Exhibit C1-7, Westfield001787).

**{¶ 39}** After the insurer's acceptance of the offer in *Columbia*, further events occurred, including the exchange of release forms and settlement drafts, stipulations for an order of dismissal, a signed release by the estate's executor on October 17, 1983, and court approval of the settlement, which included funds for the minor children, on October 25, 1983. *Columbia* at 236. The Sheriff's Office then filed a contribution claim against the discharged tortfeasors on October 8, 1984. However, the trial court found the claim was barred because it had not been filed within one year as required by the Florida statute. *Id.*

**{¶ 40}** On appeal, the Sheriff's Office argued the suit was timely because there was no binding agreement until the court approved the settlement on October 25, 1983, and the court of appeals agreed. Specifically, the court stated that the trial court's finding gave "an unwarranted legal effect to the negotiation and settlement discussions between counsel in this case" and also "require[d] that the statute be given a legal effect which we

do not believe was intended." *Id.* at 236-237. The issue, as the court saw it, was whether an enforceable agreement to discharge the common liability existed before court approval of the settlement. In finding that it did not, the court relied on several points.

{¶ 41} First, by statute, "the executor of the decedent's estate could not authorize plaintiff's counsel to bind the plaintiff to a settlement figure without court approval, since the interests of minor beneficiaries were involved." *Id.* at 237, citing Fla.Stat.Ann. 768.25. Additionally, the court focused on the fact that attorneys have no general authority due to their status to settle claims. The client also did not have an obligation to settle for the amount in question, nor did the client even have the ability to accept the amount without court approval. *Id.* Furthermore, the agreement's basic terms were outlined in the "correspondence and telephone conversations, all of which preceded the actual tender of a settlement draft and releases to be signed by the executor." *Id.* The court noted that "[t]hese were obviously preliminary steps, contemplated by each attorney, leading up to the request for settlement authority which had to be secured from the federal district court." *Id.* In addition, the court remarked that the attorney, on behalf of the Sheriff's Officer and its carrier, "could not unilaterally 'agree' to discharge the common liability within the meaning of the statute, since no agreement whereby the executor of the estate could execute a release granting such discharge could be effective without court approval." *Id.*

{¶ 42} We find this reasoning persuasive. Like Florida, Ohio conditions the ability of a personal representative to settle a wrongful death case on probate court approval. *See* R.C. 2125.02(E). "The probate court's approval of a settlement agreement is

necessary because the probate court is charged with determining whether a settlement is " 'fair and equitable.' " *In re Estate of Kenington*, 2003-Ohio-2549, ¶ 8 (12th Dist.), quoting *Stacy v. Nationwide Mut. Ins. Co.*, 125 Ohio App.3d 658, 666 (6th Dist. 1998). In fact, courts have refused to enforce wrongful death settlements or have held them void where probate court approval has not been sought or obtained. *Fosnight v. Esquivel*, 106 Ohio App.3d 372, 375 (3d Dist.1995); *Boyd v. Cleveland Clinic Found.*, 2012-Ohio-2513, ¶ 15 (8th Dist.).

{¶ 43} Here, Scheuer testified that the $6,000,000 payment was subject to signed releases and probate court approval. Tr. at 375, 398-399, 403, and 405. In addition, there were issues about structured settlements for the minors and liens against proceeds that needed to be resolved and approved by the probate court. *Id.* at 405-406 and 412-413. Accordingly, we conclude that Westfield's contribution action was timely commenced, as it was filed within a year after the probate court approved the settlement and Westfield paid the claim.

{¶ 44} As an additional point, the Michigan case that Westfield cited used the date the order was entered approving the wrongful death settlement and distribution of proceeds as the time when the parties' agreement was enforceable. *See Charlevoix*, 193 Mich.App. at 618. Again, Michigan's statute contains the same wording as Ohio's statute.

{¶ 45} Based on the preceding discussion, the trial court did not err in overruling the motion for summary judgment or in concluding the contribution action was timely filed. The first assignment of error is overruled.

III. Error in Failing to Grant Summary Judgment on All Claims

**{¶ 46}** Kastle's second assignment of error states that:

The Trial Court Erred in Failing to Grant Summary Judgment for Kastle as to All of Westfield's Claims.

A. Whether Westfield Was a Volunteer

**{¶ 47}** As its first argument under this assignment of error, Kastle contends that the trial court should have granted it summary judgment on Westfield's claims because Westfield was a volunteer. In this regard, Kastle notes that Westfield claimed in the current case that it was seeking recovery for the entire amount it had paid. Kastle also focuses on the fact that Westfield settled the wrongful death lawsuit before issues of employer immunity and co-employee immunity were determined and fault was apportioned.

**{¶ 48}** As noted above, the trial court granted Kastle's February 14, 2022 summary judgment motion in part and overruled it in part. While the court agreed with Kastle that Westfield did not have an indemnification claim, it also found material issues of fact concerning whether Kastle was liable as a joint tortfeasor. SJ Decision at p. 8-9 and 12-13. Again, summary judgment denials are reviewable on appeal for purely legal questions, but this is not true where trial evidence reveals genuine issues of material fact and the jury finds liability on the part of the party that requested summary judgment. *Becker,* 2018-Ohio-4134, at ¶ 36. To the extent a legal issue is involved on the volunteer issue (and the jury did not actually consider whether Westfield was a volunteer), we will

consider Kastle's argument.[2]

**{¶ 49}** On the subject of contribution, R.C. 2307.25(C) allows a subrogated liability insurer to recover "the extent of the amount it has paid in excess of the tortfeasor's proportionate share of the common liability."  It is true that "any sum paid beyond a legal obligation is the act of a mere volunteer, giving rise to no cause of action for contribution." *Amerisure Cos. v. Statesman Ins. Co.*, 77 Ohio App.3d 239, 241 (1st Dist.1991), citing *Fireman's Fund Indemn. Co. v. Shelby Mut. Cas. Co.*, 95 Ohio App. 88 (1st Dist. 1953). However, "[a] contribution claim may go forward notwithstanding the lack of a judgment on the underlying claim against the contribution defendant, notwithstanding even the lack of an action on the underlying claim. . . . The contribution defendant need merely be 'liable in tort' for the same injury to be subject to a contribution claim."  *MetroHealth Med. Ctr. v. Hoffmamn-LaRoche, Inc.*, 80 Ohio St.3d 212, 215 (1997), citing former R.C. 2307.31(A),(B), and (G), and quoting subsection (A).  The court further stressed that " 'liable in tort' means no more than that the contribution defendant acted tortiously and thereby caused damages."  *Id.*

**{¶ 50}** The current statute, R.C. 2307.25, contains the same pertinent provisions as former R.C. 2307.31.  It refers specifically in subsection (B) to "settlement," and in subsection (G) to the fact that contribution may be enforced in a separate action "[w]hether or not judgment has been entered in an action against two or more tortfeasors for the same injury or loss to person or property or for the same wrongful death."

---

[2] Kastle's counsel mentioned during opening statement that the jury might hear about "volunteer payments," but this was the only time the matter was mentioned during trial. Tr. at 106.

Therefore, as a legal matter, Westfield did not need to obtain a judgment against Cohen, Shredders, or Huggins in the wrongful death action in order to pursue contribution against Kastle.

{¶ 51} Furthermore, as Westfield notes, Ohio pleading rules allow parties to allege alternate claims for relief. Westfield Brief at p. 12-13, citing Civ.R. 8(A) and (E)(2). The fact that Westfield asserted both contribution and indemnification claims was irrelevant. The summary judgment against Westfield on the indemnification claim was based on its failure to give Kastle timely notice of such a claim. SJ Decision at p. 9. This had no impact on whether a contribution claim existed.

{¶ 52} In its brief, Kastle argues that the trial court's summary judgment decision on the contribution claim was incorrect because Westfield failed to present its insurance contract to establish that it had a duty to pay on behalf of any insured and that the trial court only found that Westfield "may have" had an obligation to pay. Kastle Brief at p. 16, quoting SJ Decision at p. 12. However, this argument fails to consider the reality of the summary judgment decision. The affidavit of the Westfield complex claims specialist, Glenn Scheuer, was before the court, and it discussed his handling of the claim on behalf of Westfield's insured parties, Cohen and Shredders. SJ Decision at p. 6-7. Moreover, the court's comment that Kastle relies on followed this sentence: "The parties do not dispute that Plaintiff insured Cohen Brothers, and Metal Shredders, at the time of the death." *Id.* Consequently, the claim that Westfield failed to raise factual issues as to its obligation to any insured is puzzling. Furthermore, as noted, Kastle apparently abandoned this argument at trial. The evidence at trial also clearly reveals that Westfield

was not a volunteer and had a contribution claim.

{¶ 53} According to Scheuer, the potential damages in the wrongful death case were catastrophic or "monster damages" due to the fact that Garnett had left a surviving widow and three children. These damages included survivorship, significant economic damages, and loss of consortium and society. Tr. at 366 and 448-450. At the beginning of the wrongful death case, Westfield's reserve for the claim was quite low ($25,000). *Id.* at 446. At that time, Scheuer believed Westfield had a strong argument that Garnett, while technically employed by Cohen, was Shredders' employee and Shredders, therefore, would be immune from suit. However, Scheuer was also aware that Shredders and Huggins had done some things wrong and could easily be found liable for negligence. *Id.* at 387 and 464.

{¶ 54} Garnett's estate had the right to sue Kastle, and Cohen and Shredders also could have brought Kastle into the wrongful death suit. However, counsel for these defendants made a strategic decision not to do so. *Id.* at 387-388. Scheuer's evaluation was that both Shredders and Kastle were liable and there was a very viable contribution claim. However, neither Cohen nor Shredders wanted to bring Kastle into the lawsuit at that time, as it would only cause delay and would not change the outcome; they wanted the case settled before trial. *Id.* at 392-393.

{¶ 55} The crux of the immunity issue was whether Shredders was immune from liability as Garnett's employer under the loaned servant doctrine. In April 2018, the judge presiding over the wrongful death action denied Shredders' summary judgment motion on this issue and stated that the jury would decide it. The judge also found factual issues

as to whether Shredders' employee, Luke Huggins, was liable as a co-employee for an intentional tort. Therefore, the judge held that the jury would decide that issue as well. At that point, Scheuer increased the reserve on the case to $2,500,000. *See* Tr. at 417 and 446, and Ex. F (the April 27, 2018 decision in the Garnett lawsuit), which is attached to Kastle's Feb.14, 2022 Summary Judgment Motion (again, belying Kastle's implication that Westfield, somehow, was not involved in the wrongful death case and volunteered to pay $6,000,000 million dollars).

**{¶ 56}** Shortly after the summary judgment decision was filed, a mediation occurred in the wrongful death case. This was also close in time to the scheduled trial. Scheuer was present, met Garnett's widow, Heather, and was able to evaluate her as a witness. He considered this as much of a "game-changer" as the summary judgment decision in that he felt the jury was going to award Heather a substantial amount of money. Tr. at 384 and 389-390. After the mediation, Westfield had an opportunity to settle the case for the policy limits of $6,000,000 and decided to do that based on Scheuer's evaluation of what a jury might do if the case were tried. *Id.* at 397-398.

**{¶ 57}** At trial in this action, Kastle did question Scheuer about the "litigation section" in the claims file, which lists the case name, summaries, and things of that nature. *Id.* at 466-467. Concerning "loss details," the claims file stated that Westfield had made a determination that its insured was 100% at fault. *Id.* at 470. *See also* Kastle Ex. D-10-181. According to Scheuer, that number would have been inserted by the original handling adjuster, Diane Masterson, who put in the number after preliminary investigation. Tr. at 471. Scheuer stated that this number could be changed at any time, unlike some

fields in a claims file that cannot be edited. While Scheuer did not change the number, he also found the point irrelevant, since he, not a number in a file, made the decisions. *Id*. at 471-473.

**{¶ 58}** At most, this created a potential factual issue concerning Westfield's assessment of Kastle's liability. On the other hand, the jury was free to conclude that this was simply an insignificant clerical error and that Westfield, upon full evaluation of the case, decided that both its insureds and Kastle bore responsibility for Garnett's death. Accordingly, the trial court did not err in rejecting Kastle's summary judgment claim that Westfield was a volunteer. This was a factual issue for the jury to decide.


## B.   Whether Kastle Had a Duty to Protect the Decedent

**{¶ 59}** Kastle's second and primary argument in this context is that the trial court should have granted summary judgment because Westfield failed to prove that Kastle had a duty to protect Garnett against death in October 2014. The basis for this claim is twofold: (1) Kastle's involvement with Shredders occurred 10 months before the death; and (2) Shredders alone was responsible for ensuring the electrical line was de-energized the day of the incident.

**{¶ 60}** Again, we review denial of summary judgment for purely legal issues but do not review it if trial evidence reveals genuine issues of material fact and the jury finds liability on the part of the party that requested summary judgment. *Becker*, 2018-Ohio-4134, at ¶ 36. According to Kastle, whether a duty exists in negligence cases is a question of law for the court to decide. Kastle Brief at p. 27, citing *Mussivand v. David*,

45 Ohio St.3d 314, 318 (1989). Therefore, we will consider the summary judgment decision in this regard. " 'The question of proximate cause is ordinarily one of fact, but, where there is no conflict in the evidence, such question becomes one of law.' " *Argabrite v. Neer*, 2016-Ohio-8374, ¶ 46, quoting *Kehrer v. McKittrick*, 176 Ohio St. 192, 195-196 (1964) (Lanzinger, J., concurring).

**{¶ 61}** We review summary judgment decisions de novo. *Hudson v. Petrosurance, Inc.*, 2010-Ohio-4505, ¶ 29. "In order to obtain summary judgment, the movant must show that (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion when viewing evidence in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party." *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996), citing *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 219 (1994).

**{¶ 62}** "To prevail in a negligence action, the plaintiff must show (1) the existence of a duty, (2) a breach of that duty, and (3) an injury proximately resulting from the breach." *Robinson v. Bates*, 2006-Ohio-6362, ¶ 21, citing *Menifee v. Ohio Welding Prods., Inc.*, 15 Ohio St.3d 75, 77 (1984). "The common-law duty of due care is that degree of care which an ordinarily re[a]sonable and prudent person exercises, or is accustomed to exercising, under the same or similar circumstances. . . . A person is to exercise that care necessary to avoid injury to others." (Citations omitted.) *Mussivand* at 318-319.

**{¶ 63}** Whether a duty exists depends on an injury's foreseeability. *Menifee* at 77. "The test for foreseeability is whether a reasonably prudent person would have

anticipated that an injury was likely to result from the performance or nonperformance of an act. . . . The foreseeability of harm usually depends on the defendant's knowledge." (Citations omitted.) *Id.* To decide if alleged negligent parties "should have recognized the risks involved, only those circumstances which they perceived, or should have perceived, at the time of their respective actions should be considered. Until specific conduct involving an unreasonable risk is made manifest by the evidence presented, there is no issue to submit to the jury." *Id.*, citing *Englehardt v. Philipps*, 136 Ohio St. 73 (1939), and Prosser & Keeton, *Law of Torts,* § 31 at 169 (5th Ed.1984).

{¶ 64} The trial court's summary judgment decision addressed Kastle's claim that the actions of Shredders' plant manager, Luke Huggins, on the day of the electrocution were "an intervening, superseding cause of Mr. Garnett's death and that there is no proximate cause relating to Kastle's actions." SJ Decision at p. 12. The court also considered Kastle's claim that it owed no duty. According to Kastle, it performed the requested repairs on Shredders' system, and "Huggins was the one who turned the system 'off' and allegedly performed the required system checks before Mr. Garnett was electrocuted." *Id.* at p. 13.

{¶ 65} As factual background in its decision, the trial court remarked that:

Kastle was hired by Luke Huggins, a Cohen Brothers Employee, on December 11, 2013 to perform work related to a fallen metal roof over a transformer that was hitting a ceramic piece and causing visible arcing. Kastle performed the work and was not called back out to the facility nor requested to do any further work after December 11, 2013. There is a

dispute of fact as to whether or not an employee of Kastle told Huggins after the work was performed by Kastle that a blade in a switch was stuck.

A workplace accident occurred on or about October 14, 2014 at an industrial transformer substation on a property owned by Metal Shredders, Inc. ("Metal Shredders"). This property was the same location where Kastle had performed work. On the date of the accident Mr. Geoffrey Garnett ("Garnett") was performing repairs to the roof of the substation and was electrocuted and he died.

SJ Decision at p. 1-2.

**{¶ 66}** The claims in this case were that Kastle did not repair a switch blade which caused the electric line to be energized when the electricity was supposed to be shut off, and that Kastle failed to properly warn Shredders about the problem. Some months later (with no intervening repairs or attempts to de-energize the system), Huggins thought he had turned off the electricity. This would have allowed Garnett and another individual to safely work around the electric line and on the roof. However, the switch blade was actually stuck and did not de-energize the line. Thus, when Garnett made contact with the line, he was electrocuted.

**{¶ 67}** The evidence before the court at the time of its summary judgment decision included testimony from two experts: Mr. Lopez (for Westfield) and Mr. Neary (for Kastle). Lopez said that Kastle should have communicated in writing that the switch blade was broken and left in an unsafe condition. In addition, Lopez stated that:

"So if you call an electrical expert for something that you're not prepared to

maintain or test, then the expert being called, I believe, would be responsible for the as-found and as-left tests." "I believe they [Kastle defendants] were hired as an expert to be able to ascertain the as-found and as-left per being hired by Luke, who is an ignorant -- not an electrical -- knows some electrical, enough to turn on and off the switch, which he was authorized to do. Upon hiring the electrical experts, I believe the responsibility went to Kastle Electric and the employees they sent to do the as-found and as-left tests and explain correctly that the switch was left broken."

(Footnotes omitted.) SJ Decision at p. 12, quoting Lopez Deposition at 102 and 113.

**{¶ 68}** In contrast, Neary placed the obligation on Shredders to verify that the transformer was de-energized on the day of the accident. He further stated that lack of notice was irrelevant, and Kastle's actions did not contribute to Garnett's death. *Id.* at p. 13. Given this dispute, the trial court found factual disputes as to whether Kastle's actions proximately caused Garnett's death and as to Kastle's negligence, i.e., duty. *Id.*

**{¶ 69}** To assess Kastle's argument, we have reviewed Lopez's entire deposition. There, Lopez stated that Kastle was required to communicate to Shredders in writing that a problem existed with the switch, and that the person or entity (Kastle) "that improperly did the maintenance and testing contributed to the electrical system being energized at the time of the electrocution." *Id.* at 101-102 and 103. Lopez also stated that while Huggins had the sole responsibility of de-energizing the system in October 2014, Kastle, having been hired as an expert (as the trial court noted), was responsible to do as-found

and as-left tests and explain correctly to Shredders that the switch was left broken. *Id.* at 116-117. In addition, Lopez said that Kastle could have labeled the equipment or could have locked it out to force Shredders to repair the switch before getting power back. While lockout was not mandatory, Lopez stressed that Kastle could have chosen that, "just understanding how dangerous and how unsafe that switch was with that broken blade." *Id.* at 124.

**{¶ 70}** There is no way Lopez's deposition could reasonably be viewed as absolving Kastle of responsibility for Garnett's death or as designating Shredders as the sole or intervening cause. Instead, Lopez indicated that Kastle, in its role as an electrical service company, had a duty to warn or protect against a known dangerous condition, and negligently failed to do so. Combined with Shredders' negligence, Kastle's actions proximately resulted in Garnett's death. Accordingly, the trial court did not err in denying summary judgment to Kastle. The issues properly were for the jury to decide, and the jury, in fact, found Kastle 40% liable for Garnett's death.

**{¶ 71}** Based on the preceding discussion, the second assignment of error is overruled.

### IV.   Admission of Alleged Hearsay Evidence

**{¶ 72}** Kastle's third assignment of error states as follows:

The Trial Court Abused Its Discretion in Allowing Inadmissible Hearsay as to an Essential Element of Westfield's Contribution Claim at Trial, i.e., a Valid Written Release.

{¶ 73} Under this assignment of error, Kastle contends the trial court abused its discretion by letting Westfield's complex claims adjuster, Scheuer, authenticate a release that was obtained as a result of the payment of $6,000,000 to Garnett's estate. According to Kastle, Scheuer was unable to provide any testimony about who prepared the document or when it was prepared or signed, and the trial court should not have allowed authentication as a business record. Kastle also argues that the court's error caused substantial prejudice because, as part of its contribution claim, Westfield was required to prove it had obtained a written release of common liability for all tortfeasors.

{¶ 74} "Decisions involving the admissibility of evidence are reviewed under an abuse-of-discretion standard of review." *Estate of Johnson v. Randall Smith, Inc.*, 2013-Ohio-1507, ¶ 22, citing *State v. Hancock*, 2006-Ohio-160. "For an abuse of discretion to have occurred, the trial court must have taken action that is unreasonable, arbitrary, or unconscionable." *Id.*, citing *State ex rel. Beacon Journal Publishing Co. v. Akron*, 2004-Ohio-6557, ¶ 59. "[M]ost instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). Decisions are unreasonable if they are unsupported by a sound reasoning process. *Id.*

{¶ 75} As previously noted, R.C. 2307.25(B) allows tortfeasors who have settled with claimants to seek contribution from another tortfeasor whose liability has been extinguished. In turn, R.C. 2307.25(C) grants insurers a subrogation right to pursue contribution claims and step into the shoes of their insured tortfeasors.

{¶ 76} In this context, R.C. 2307.28(A) provides that:

When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons for the same injury or loss to person or property or the same wrongful death, both of the following apply:

(A) The release or covenant does not discharge any of the other tortfeasors from liability for the injury, loss, or wrongful death unless its terms otherwise provide. . .

(B) The release or covenant discharges the person to whom it is given from all liability for contribution to any other tortfeasor.

{¶ 77} "The statutory phrase 'unless its terms otherwise provide' requires a release to expressly designate by name or to otherwise specifically describe or identify any tortfeasor to be discharged." *Beck*, 1 Ohio St.3d at 235, interpreting former R.C. 2307.32(F)(1) (now R.C. 2307.28(A)). Therefore, as part of its contribution claim, Westfield was required to show that it had obtained a release that extinguished claims against Kastle.

{¶ 78} As indicated, Kastle argues that Westfield failed to properly authenticate its release and that, as a result, its contribution claim should be precluded. We are puzzled over why Kastle has created such an issue over the release, both before trial, during trial, and on appeal, when this should have been a simple matter of stipulation.

{¶ 79} The trial in the current case took place in September 2023. Although Kastle was not involved in the Garnett lawsuit, it did have the opportunity on May 6, 2022,

to take Scheuer's deposition. This was about 16 months before trial. During the deposition, a copy of a Release and Indemnity Agreement ("Release") was marked as Exhibit E. Deposition of Glenn Scheuer (May 6, 2022), 58. The Release is a four-page document and contains signatures identified as follows: (1) "Frank Gallucci, III. attorney for Heather Garnett. individually and as legal representative of the Estate of Geoffrey S. Garnett"; (2) "Heather Garnett, individually and as legal representative of the Estate of Geoffrey S. Garnett"; and (3) "Kent Cohen. Authorized Representative of Metal Shredders, Inc." *Id.* at Ex. E, p. 3-4. There was also a signature of a witness, who was not otherwise identified by a printed name. *Id.* at p. 3.

{¶ 80} As relevant here, the first paragraph of the Release states that:

For Consideration of SIX MILLION DOLLARS AND 00/100 CENTS ($6,000,000.00), to be paid as a cash lump sum to fund the Periodic Payments as set forth in the attached Structured Settlement Addendum, the receipt and sufficiency of which is hereby acknowledged, the representative of the Estate of Geoffrey S. Garnett and Heather Garnett, individually and as legal representative of the Estate of Geoffrey S. Garnett, deceased, and on behalf of herself and all next-of-kin of Geoffrey Garnett (hereinafter collectively "Releasors") hereby release and forever discharges Metal Shredders, Inc., Luke Higgins, Cohen Brothers, Inc., Dayton Power and Light, DPL, Inc., Kastle Electric Company, Westfield Insurance Company, Westfield Group, and any and all of their subsidiaries, related companies, affiliates, employees, officers, heirs, executors, representatives,

administrators, insurers, attorneys, agents, and assigns, and all other persons, firms, or corporations liable or who might be claimed liable (hereinafter collectively "Releasees"), none of whom admit any liability to the undersigned but expressly deny any liability, from any and all claims, demands, interest, attorney fees, damages, actions, causes of action or suits of any kind or nature whatsoever, known or unknown and particularly on account of all injuries, survival claim and wrongful death claim which resulted from an accident that occurred on or about the 16th day of October, 2014, in Montgomery County, Ohio, and which resulted in fatal injuries to decedent, Geoffrey S. Garnett. This release includes but is not limited to all claims which were brought or could have been brought in the case of Garnett v. Metal Shredders, Inc., Case No. 2016 CV 05284, Common Pleas Court of Montgomery County, Ohio and Releasors agree to promptly execute and file a dismissal of that Law suit in its entirety, with prejudice, at Defendant Metal Shredders, Inc.'s court costs.

Release at p. 1.

{¶ 81} When Scheuer was asked if he recognized any of the signatures, he said, "I know who they are" and also said he recognized the signatures, "other than the witness." Scheuer Depo. at 59. Scheuer further said he assumed that he had previously seen Gallucci's signature on various correspondence and had probably seen Heather's signature on a sworn discovery response. Id. at 59-60. In addition, Scheuer stated that he was not present when the Release was signed. Id. at 60. Scheuer said

he did not author the document but would have had input.  *Id.* at 62.

**{¶ 82}** As noted, Kastle had access to this release 16 months before trial.  The exhibit admitted at trial (Ex. 9) was the same release that was identified and discussed at Scheuer's deposition.  Furthermore, the joint pretrial statement the parties filed in May 2022 included among the facts established by admissions in the pleadings, admissions by discovery, and stipulated facts that Kastle and its employees were included in the release from liability to Garnett and his estate as a party of the settlement.  Joint Pretrial Statement (May 10, 2022), p. 3 and 5.  Given Kastle's possession of the release and the stipulation, Kastle's continued objections to its admissibility are without merit.

**{¶ 83}** Regarding this point, Westfield had included the Release as a trial material, and Kastle objected to it (along with other trial materials) on May 10, 2022, even though Kastle had made the above stipulation the same day.  At that time, trial was scheduled for May 23, 2022.

**{¶ 84}** Kastle also filed a motion in limine on May 10 seeking to preclude Westfield from introducing the release at trial.  The grounds included Westfield's failure to list any signatories as trial witnesses, lack of authentication, and hearsay.  In response, Westfield argued that the document could be authenticated as a business record through a qualified witness, Scheuer.  Kastle subsequently also argued that Westfield could not introduce a release reportedly authored or signed by someone Kastle did not have the opportunity to cross-examine.  Defendant's Reply in Support of Objections to Plaintiff's Trial Materials (May 17, 2022), p. 4-7.  Later, the court vacated the trial date and reset trial for October 24, 2022, based on an unrelated legal issue.  See Amended Final

Pretrial Order (May 19, 2022). In July 2022, the court again continued the trial until March 13, 2023, and set a new deadline of February 13, 2023, for completion of all discovery. Thus, if Kastle had legitimate questions about the Release (to which it had already stipulated), Kastle could have subpoenaed and cross-examined the persons who had signed it.

{¶ 85} Instead, on January 31, 2023, Kastle scheduled another deposition of Scheuer for February 7, 2023, and listed 20 matters on which examination was requested. These items included: "[i]nsured status of those released as stated in release signed by the Garnett estate" (even though Kastle had already stipulated in the joint pretrial statement to the fact that Kastle and its employees were covered by the release). Westfield's list of trial materials filed on February 16, 2023, again included the Release, which was identified as #9 (the same exhibit number that was ultimately used at trial). Kastle once again objected to the Release as hearsay and stated it had had no opportunity to challenge or verify "the creation of, facts underlying, and agreement(s) reached in the subject release through cross-examination." Objections of Defendants, Kastle Electric Co. . . . to Plaintiff's Amended Trial Materials (Feb. 23, 2023), p. 2.

{¶ 86} It turns out that Kastle took Scheuers' deposition on February 7 as well as February 15, 2023, and it filed those depositions and voluminous exhibits with the court. *See* Defendant's Motion to File Exhibits to the Deposition Transcripts of Glenn Scheuer on Flash Drives (Feb. 22, 2023). On February 27, 2023, Kastle filed another motion in limine to preclude Westfield from using the Release, again on the same grounds. On the same day, the parties also filed another joint pretrial statement. This time,

stipulations about the release were not mentioned, but the parties did make the following stipulation: "The parties are willing to enter into a stipulation as to the Westfield Claim File Combined (Defendants' Trial Material D) including without limitation it being an authentic, true and accurate copy, subject to the court's decision on which portions of the claim file may be properly redacted." Joint Pretrial Statement (Feb. 27, 2023), p. 5.

{¶ 87} On March 2, 2023, the court filed an amended pretrial order again continuing the trial, this time to September 18, 2023. Westfield then responded to Kastle's motion in limine. After Kastle replied, the court overruled the motion in limine, stating that its review "of the materials indicate that a witness with knowledge can authenticate the Release and it is not inadmissible hearsay as it is a business record." Decision and Entry Overruling Defendant's Motion in Limine Concerning the Release. (Aug. 10, 2023), p. 1.

{¶ 88} The trial began on September 18, 2023. During trial, Kastle objected to use of the Release, and the court overruled its objections (other than one objection to a leading question). *See* Tr. at 398, 400-402, and 409-410. Kastle also objected to admission of Ex. 9 (the Release), but the court overruled that objection as well. *Id.* at 614-615.

{¶ 89} Kastle contends that Scheuer was not qualified to identify and authenticate the Release because he was not a party to it, did not create it, and gave no testimony about "the record-keeping system that produced the document." Kastle Brief at p. 22. In addition, Kastle argues that the court erred in letting Scheuer present hearsay testimony about the release's contents.

{¶ 90} Taking authentication first, Evid.R. 901(A) states that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The rule then provides various examples of how authentication can be satisfied. One of these is through the testimony of a witness with knowledge that "a matter is what it is claimed to be." Evid.R. 901(B)(1).

{¶ 91} To the extent that Kastle refers to a "record-keeping system," that involves Evid.R. 901(B)(9), "which allows authentication through '[e]vidence describing a process or system used to produce a result and showing that the process or system produces an accurate result.' " *Royse v. Dayton*, 2011-Ohio-3509, ¶ 31 (2d Dist.). In *Royse*, the city attempted to authenticate drug test results that were done by one company and were then reviewed by a different company that did not conduct any testing. The city's only witnesses in the case were its safety administrator and the city's designated employer representative, neither of whom had tested the samples or had any personal knowledge about the record-keeping of these two facilities. Further, neither witness had tested the samples, and neither had any knowledge of the testing facility's procedures. *Id.* at ¶ 4-5 and 28-29. Based on these facts, we found "no evidence of record demonstrating that the documentary evidence of positive test results and the ultimate conclusions reached therefrom were trustworthy." *Id.* at ¶ 30.

{¶ 92} The current case does not involve such a situation. There were no systems or processes like a laboratory that performs drug tests. Instead, an insurance company decided to pay money to injured claimants and counsel prepared and obtained

a release of liability for the company's insureds. This is not a scientific matter, nor is it complicated; rather, it is a routine event for insurers.

{¶ 93} We have stressed that "the threshold standard for authenticating evidence pursuant to Evid.R. 901(A) is low, and 'does not require conclusive proof of authenticity, but only sufficient foundational evidence for the trier of fact to conclude that . . . [the evidence] is what its proponent claims it to be.' " *State v. Young,* 2002 WL 471846, *2 (2d Dist. Mar. 29, 2002), quoting *State v. Easter*, 75 Ohio App.3d 22, 25 (4th Dist. 1991). " 'Any firsthand knowledge of a writing, however acquired, is an appropriate basis for testimony on the issue of authentication where the testimony logically connects the documents with the issues of the case.' " *Alexander v. Urban Communications Television, Inc.*, 2000 WL 799757, *6 (2d Dist. June 23, 2000), quoting *Bross v. Smith*, 80 Ohio App.3d 246, 251 (12th Dist. 1992). "Further, the Rules of Evidence do not mandate that proof of authorship is required before a document can be admitted into evidence." *Id.*, citing *Bross* at 252.

{¶ 94} At trial, Scheuer testified that Heather, individually and on the estate's behalf, had signed a release (Ex. 9) of all claims in exchange for the settlement amount, and that the release was part of the claims file. Tr. at 399-400. As he had in his deposition, Scheuer stated that he was part of the discussion in obtaining the release. He also said the release would have been mailed to him by an attorney Westfield had been working with to defend against the claims. *Id.* at 401-402. Additionally, Scheuer said that release of the funds was contingent on satisfaction of the terms and conditions of the settlement (which included signing a release). *Id.* at 399 and 402. In light of this

testimony, the release was properly authenticated. We also note that the Scheuer deposition exhibits (which Kastle filed with the trial court) indicate that Scheuer was heavily involved in the release review and process. They also demonstrate how he received a copy of the Release. *See* Kastle Ex. C1-5, C1-6, C-107, and C-153-154 (also marked generally as Ex. VolII_K).

{¶ 95} As to the hearsay issue, Westfield contends that Kastle waived any hearsay objection by failing to raise it at trial. *See* Westfield Brief at p. 20. However, this is incorrect, as Kastle did object on this ground. Tr. at 400. "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Evid.R. 801(C). Hearsay is inadmissible, subject to certain exceptions. *See* Evid. R. 802. Some such exceptions are stated in Evid.R. 803, which provides in pertinent part that:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . .
>
> (6) Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided

by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

{¶ 96} Westfield provided ample evidence to demonstrate compliance with Evid.R. 803(6). Scheuer explained in detail his experience at Westfield and his role as the supervisor responsible for the claims file, which in this case was opened within a week after the October 2014 incident and included thousands of pages of information. Tr. at 359-371. Scheuer further stated that he was part of the discussions about the release, that the Release was part of his claims file, and that he had received it from an attorney Westfield engaged to defend its insured parties. *Id.* at 401-402.

{¶ 97} In addition, Scheuer testified that the data in the claim file is supposed to truly and accurately reflect facts as they are at the time when recorded, and that claims files notes and documents cannot be deleted. *Id.* at 472-473. Kastle also stipulated to the authenticity of the claims files notes, which, again, included information about Scheuer's participation in the release and how he received it. Tr. at 463-465 and Joint Pretrial Statement (Feb. 27, 2023) at p. 5. Assuming for the sake of argument that this particular stipulation extended only to the part of the claims file that Kastle intended to use at trial, there is no logical basis for maintaining that one part of a claims file is authentic and other parts are not (at least without any evidence on that issue, which was lacking here).

{¶ 98} As a final point, we note again that Kastle stipulated before trial that Kastle and its employees were included in the release from liability to Garnett and his estate as party of the settlement. Joint Pretrial Statement (May 10, 2022) at p. 3 and 5. This is completely inconsistent with Kastle's later objections.

{¶ 99} In light of the preceding discussion, the third assignment of error is overruled.


V. Duty to Garnett

{¶ 100} Kastle's fourth assignment of error states that:

The Trial Court Erred in Denying Kastle's Motion for Directed Verdict and Judgment Notwithstanding the Verdict Where Reasonable Minds Could Only Find Westfield's Insureds Alone Owed a Duty to Mr. Garnett on the Date of Death.

{¶ 101} Under this assignment of error, Kastle contends, as it did in connection with summary judgment, that Shredders alone had a duty to Garnett on the day of the accident, that Westfield failed to establish that Kastle's actions proximately caused Garnett's death, and that Shedders' intervening or superseding negligence broke any causal connection between Kastle's actions and Garnett's injury.

{¶ 102} At the end of Westfield's case, Kastle moved for a directed verdict on various issues, including duty and causation, and the court overruled the motion. Tr. at 318-321. Kastle's argument in this regard was that the person who took the system offline in October 2014 (Huggins) was the party responsible for Garnett's death. *Id.* at

620. Kastle renewed this motion at the end of its own case, and the court again overruled it. *Id.* at 376-377. Kastle then filed a JNOV motion and alternatively, motion for new trial, based on the same arguments it now raises on appeal. In its decision, the court rejected all of Kastle's arguments. *See* Decision and Entry Overruling Defendant, Kastle Electric Co., now known as Tgd&P, Inc., Motion for Judgment Notwithstanding the Verdict or, in The Alternative, New Trial ("JNOV Decision") (Jan. 5, 2024), p. 4-8.

{¶ 103} Kastle's JNOV motion was made pursuant to Civ.R. 50(B), which raises a question of law, not factual issues. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 25, citing *Posin v. A.B.C. Motor Court Hotel, Inc.*, 45 Ohio St.2d 271, 275 (1976). Consequently, in considering such motions, "a court does not weigh the evidence or test the credibility of the witnesses." *Osler v. City of Lorain*, 28 Ohio St.3d 345 (1986), syllabus.

{¶ 104} " 'The test to be applied by a trial court in ruling on a motion for judgment notwithstanding the verdict is the same test to be applied on a motion for a directed verdict. The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied.' " *Id.*, quoting *Posin* at 275.

{¶ 105} We have already outlined the elements of negligence, which include duty, breach of the duty, and that the breach proximately caused injury. *Robinson*, 2006-Ohio-6362, at ¶ 21. In addition, we discussed due care and foreseeability and agreed with the trial court that these were issues for the jury to resolve. The trial testimony was no

different than what we have previously considered.

**{¶ 106}** At trial, Westfield presented testimony from the Kastle employees (James Hardin, Manuel Herald, and Sam Luttrell) who were at Shredders' premises on December 11, 2013. Westfield also called Huggins (Shredder's plant supervisor) and Jesus Lopez (a professional engineer) as witnesses. Kastle called only one witness, Herald.

**{¶ 107}** According to the testimony, Shredders did not have a regular preventative maintenance contractor for its plant. When electrical repairs were needed, Huggins used various contractors, one of which was Kastle. On December 11, 2013, Kastle received a call indicating that Shredders had lost power, and Hardin and Herald went to Shredders to see what was going on. When they arrived, they found that a metal roof had collapsed on a transformer; the roof was glowing red even though the power had been shut off. Tr. at 109-110, 222-223, 230-231, and 624.

**{¶ 108}** The transformer was being fed by a substation that was inside a locked fence, and the switchgear cabinets within the substation had eye-level windows that someone could look through. *Id.* at 130 and 627-629. When Hardin and Herald looked through the window of one of the cabinets, they saw that one of three knife blades (the "B" blade) was stuck in the on position, still energizing the transformers, and the other two blades (the "A" and "C" blades) were off. Herald stated that they told Huggins, and he looked in and saw the blade was stuck. *Id.* at 111 and 630-631.

**{¶ 109}** Herald also said they told Huggins that they did not have the PPE (protective equipment) to open the cabinet. *Id.* at 632. If Kastle's employees had opened the cabinet door, it was possible that nothing would happen or that there would

be an explosion that would cause severe injury. Due to this issue, another Kastle employee, Luttrell, then brought the following equipment to Shredders: an arc suit, a hot stick, and an audible tester, which senses whether voltage is present. *Id.* at 112 and 632-634. After donning the PPE, Hardin opened the door and used the hot stick to grab the B knife blade and put it in the off position. *Id.* at 113 and 153. The red glow began to dissipate, and that indicated the power was off. *Id.* at 642-643. Hardin and Herald's best assumption was that a mechanical problem inside kept the blade engaged. Kastle did not fix that type of issue because it only employed inside wiremen who dealt with lower voltages and were not qualified to do such repairs. *Id.* at 153-154 and 193.

{¶ 110} Although the power appeared to be off, Hardin, while still in protective gear, did additional testing at the secondary and load sides of the transformer, at the load side of the switchgear box, and at the line side of the substation to make sure the power was off. They also pulled the fuses out at the substation. Tr. at 155-156 and 643-646. At that point, Huggins had some work to do, i.e., getting the roof off the transformer, so Hardin and Herald told him they were not going to put the fuses back in. They then went to lunch and to pick up some parts. Before they did so, they closed the cabinet and put locks on it with their tag, which contained their names, phone numbers, and the date the power was turned off. There were two locks because each person working on something has a lock. *Id.* at 652.

{¶ 111} When they returned to Shredders, Hardin suited up again and retested everything, doing the same tests to make sure everything was off. Their locks were still on and the fuses were out; Hardin and Herald then did minor work in the transformer area.

*Id.* at 133, 169, and 172. They had also determined there were blown fuses in the gearbox at the substation and replaced them. The fuses to the A and C blades were bad; the fuse to the B blade was not, and that is why the line had still been energized. *Id.* at 132, 172, and 649-650. According to the Kastle employees, they asked Shredders to turn on its machine to make sure it operated. However, Huggins testified that Kastle left the line de-energized and that after he worked on the roof, he reenergized the system the next day. *Id.* at 175 and 255,

{¶ 112} When the Kastle employees left, they did not put any locks on the cabinet to prevent the system from being used, nor did they put a tag or written notice on the cabinet to provide a warning about the broken switch or its danger. *Id.* at 117-118, 172, 188, 236, 256, and 288.

{¶ 113} While Huggins admitted at trial (after being refreshed by his 2017 deposition) that Kastle had told him something about a stuck knife blade, he also said he assumed it had been fixed. Tr. at 281-283 and 286-287. He had no suspicion that it had not been fixed and had a firm belief it had been fixed until Garnett's accident happened. *Id.* at 236-337. Huggins further said that the Kastle employees did not tell him that they did not know how to fix the knife blade, that they were not capable of fixing it, or that Kastle did not work on equipment like that. *Id.* at 288. Kastle also did not leave any warning sign to keep people from engaging or disengaging that switch. *Id.* In contrast, Herald testified that he told Huggins that Kastle did not repair switches and that he needed to contact the manufacturer or get a service technician out to repair it. *Id.* at 658-659. According to Herald, Huggins said he could do that, and he told Huggins, "well,

it needs to be sooner than later." *Id.* at 559-660.

{¶ 114} There is no dispute that when Kastle sent a bill to Shredder, it did not mention the blade switch or any repairs to it. On the other hand, there were a number of things Kastle did not include on the bill, like telling Huggins about the knife blade, obtaining PPE, fixing the transformer, etc. *Id.* at 134-136, 236, 283, and 662-664. After December 11, 2013, Kastle did not return to Shredders, and no one else serviced or repaired the substation or the switch blade before the accident.

{¶ 115} As noted, in October 2014, Huggins attempted to turn off the power so that Garnett and another welder could repair the roof. *Id.* at 232-233 and 234. Huggins successfully flipped the switch down and then used a voltage meter to see if any voltage was coming out. He checked the line going from the substation to the transformer, and nothing registered. *Id.* at 234 and 261-262. Huggins did not check the meter against a known hot source, did not remove the fuses, and did not ground out the line. *Id.* at 260 and 265-266. Huggins was not an electrician and had only in-house training by supervisors and what he had picked up from contractors coming to the site. Huggins did not know how to ground out the system before starting to work, as Shredders mainly relied on the voltage meter. He also had not been trained to check a known hot source. *Id.* at 240, 246, 261, 263, 272, and 275.

{¶ 116} The meter was 15 years old, and Huggins was not aware that it should be calibrated annually. As a result, he did not do that and had never checked the meter to see if it was working properly. Tr. at 249 and 275. Huggins was also unaware that the meter should be discarded after two years. *Id.* at 274. Unfortunately, the power was

not shut off, and Garnett was electrocuted. *Id.* at 235 and 258.

{¶ 117} The day of the accident, Huggins called Kastle to come out. Herald went to the scene and observed that the knife blade was still stuck. An electrical maintenance person from Cohen asked Herald what could be done to make the switch work better, and he suggested grease, because at that point, they did not know whether the blade was gummed up or if something mechanical, like a spring, was not pulling it out. *Id.* at 665-666.

{¶ 118} At trial, Westfield presented testimony from Jesus Lopez, a professional engineer; Kastle did not call an expert to testify. Lopez testified, as he had in his deposition, that Kastle had been negligent in various ways, including leaving Shredders' site with the power on and the switch in an very unsafe positon when the reasonable action of an expert electrician would have been to not allow the switch to be used. *Id.* at 299-300. Lopez further said that leaving the switch in this condition and failing to communicate in writing about the condition of the switch and the need to repair it promptly to a safe condition was a violation of the National Electrical Code ("NEC"). *Id.* at 300. He stated that Kastle had violated the NEC by failing to tell Shredders that it could not turn the power back on without the repair being made, by failing to lock out the switch and put signage on it, by not bringing in an expert to assist, and by failing to contact the utility company to turn the power off. *Id.* at 302-303. Additionally, Lopez testified that Kastle violated the duty of care of a reasonable electrician by failing to notify Shredders in writing of the "as-found" and "as-left" information, per the National Fire Protection Association guidelines. *Id.* at 303. All of Lopez's opinions were stated within a reasonable degree

of engineering certainty. *Id.* at 300-303.

{¶ 119} Following these remarks, this exchange occurred:

Q: Do you have an opinion, within a reasonable degree of engineering certainty, as to whether the conduct of Kastle and their failure to repair, their failure to warn, their failure to post a sign, their failure to call someone else, their failure to deenergize the utility, proximately caused the death of Geoffrey Garnett?

A: I believe that they played a large part in doing that, in not reporting it, not allowing Metal Shredders to -- to respond to the reports of repairing the switch and the necessity, especially in this case where it was -- it was a lethal mistake, right? It was something that involved a danger to have left that equipment the way it was.

Tr. at 304.

{¶ 120} Lopez also said that Shredders' conduct had contributed to Garnett's death and that Shredders shared responsibility. *Id.* at 304, 320. In addition, Lopez stated that he was not able to put a percentage of combined fault on anyone. *Id.* at 357-358.

{¶ 121} The trial testimony of Kastle's employees indicated that they were well aware of the high degree of death or injury associated with electricity and malfunction of the blades and took extra precautions because of the danger. *E.g.*, Tr. at 160 (after pulling the knife blade out, Hardin checked the voltage at the blade as an extra precaution because 4000 volts "could cause death or serious bodily injury"). Luttrell, who was

Kastle's service manager in December 2013, testified that it would be possible to put a notice on equipment saying a switch was broken, but Kastle's practice was to verbally tell a customer what the problem was and trust the customer had the knowledge to deal with it. *Id.* at 187-188. Luttrell acknowledged that a tag would have cost about 30 cents and that it would have taken 30 seconds to write on the tag. *Id.* at 189.

{¶ 122} Consistent with the above facts, the trial court concluded that Kastle's employees knew of the risk of danger and death the knife blade presented, and it was foreseeable that someone like Garnett would eventually access them. The court also found a possible inference could be made that Shredders was the entity with knowledge of the risk and the duty to verify de-energization. JNOV Decision at p. 5. However, the court stressed that: "Review of all the testimony would allow one to find that inference may not be drawn or other inferences may be drawn. It is not the conclusion that is required by consideration of the expert's [Lopez's] testimony." *Id.* We agree.

{¶ 123} Further, given Lopez's "substantive" and "probative" expert testimony, the court found sufficient evidence to support a conclusion that the negligence of both Shredders and Kastle contributed to Garnett's injury and death. *Id.* at p. 7. Again, we agree.

{¶ 124} "Causation is established using the 'but for' test." *Rieger v. Giant Eagle, Inc.*, 2019-Ohio-3745, ¶ 12, citing *Anderson v. St. Francis-St. George Hosp., Inc.*, 77 Ohio St.3d 82, 84 (1996). "A defendant's conduct is the cause of the harm if the harm would not have occurred but for the defendant's act or failure to act." *Id.*

{¶ 125} "Whether an intervening act breaks the causal connection between

negligence and injury depends upon whether that intervening cause was reasonably foreseeable by the one who was guilty of the negligence. If an injury is the natural and probable consequence of a negligent act and it is such as should have been foreseen in the light of all the attending circumstances, the injury is then the proximate result of the negligence. It is not necessary that the defendant should have anticipated the particular injury. It is sufficient that his act is likely to result in an injury to some[]one." *Mudrich v. Std. Oil Co.*, 153 Ohio St. 31, 39 (1950), citing *Neff Lumber Co. v. First Natl. Bank of St. Clairsville,* 122 Ohio St. 302, 309 (1930). *Accord Cascone v. Herb Kay Co.*, 6 Ohio St.3d 155, 160 (1983).

{¶ 126} " 'A rule of general acceptance is that, where the original negligence of the defendant is followed by the independent act of a third person which directly results in injurious consequences to plaintiff, defendant's earlier negligence may be found to be a proximate cause of those injurious consequences, if, according to human experience and in the natural and ordinary course of events, defendant could reasonably have foreseen that the intervening act was likely to happen.' " *Smith v. Hess*, 2018-Ohio-3602, ¶ 17 (2d Dist.), quoting *Taylor v. Webster*, 12 Ohio St.2d 53, 56-57 (1967). Stated " 'a little differently, the connection between the defendant's negligence as a proximate cause of an injury is not broken, if an intervening event is one which might in the natural and ordinary course of things be anticipated as reasonably probable, and the defendant's negligence remains an important link in the chain of causation.' " *Id.*

{¶ 127} Given the evidence, Kastle could have anticipated in the ordinary course of events that a third party would attempt to de-energize the switch and that the blade

would again stick.   Again, we do not weigh witness credibility or the evidence.

{¶ 128} Furthermore, "intervention of a responsible human agency between a wrongful act and an injury does not absolve a defendant from liability if that defendant's prior negligence and the negligence of the intervening agency co-operated in proximately causing the injury.   If the original negligence continues to the time of the injury and contributes substantially thereto in conjunction with the intervening act, each may be a proximate, concurring cause for which full liability may be imposed. 'Concurrent negligence consists of the negligence of two or more persons concurring, not necessarily in point of time, but in point of consequence, in producing a single indivisible injury.' " *Berdyck v. Shinde*, 66 Ohio St.3d 573, 584 (1993), quoting *Garbe v. Halloran*, 150 Ohio St. 476 (1948), paragraph one of the syllabus.   These statements apply here.   Kastle's negligence continued until the day of Garnett's death and proximately contributed to it.

{¶ 129} Accordingly, the trial court properly left the issue to the jury and did not err in denying Kastle's JNOV motion as it pertained to these issues.   The fourth assignment of error is overruled.


VI.   Issues Concerning Non-Economic Damages

{¶ 130} Kastle's fifth assignment of error states that:

> The Trial Court Erred in Denying Kastle's Motion for Directed Verdict
> and New Trial as to Non-Economic Damages Where Westfield Presented
> No Admissible Evidence of the Same.

{¶ 131} Under this assignment of error, Kastle contends the trial court erred in

letting Westfield introduce hearsay evidence (probate court documents) relating to non-economic damages that were attributed to Garnett's death. Kastle further contends it was denied a "fair trial" because the court allowed Scheuer to testify about Heather's "likeability" instead of requiring Westfield to introduce direct evidence about non-economic damages. Kastle Brief at p. 35. Finally, Kastle argues that the jury erred in failing to subtract any amount for Garnett's survivorship claim and was uncertain about what it needed to find because it crossed off one figure on an interrogatory for non-economic damages and awarded a different amount.

{¶ 132} Kastle's JNOV/new trial motion asked for a new trial under Civ.R. 59(A)(1) due to irregularities in the proceedings which denied it a fair trial. These alleged irregularities were: (1) admission of the Release; (2) admission of the probate court's file concerning distribution of the wrongful death proceeds; and (3) Scheuer's testimony that a jury would have " 'loved' " Heather. Motion of Defendant, Kastle Electric Company . . . for Judgment Notwithstanding the Verdict or, in the Alternative, New Trial ("JNOV Motion") (Oct. 31, 2023), p. 25-27. In the motion, Kastle also argued that Westfield failed to establish non-economic damages because it did not call any Garnett family members to testify. *Id.* at p. 26-27.

{¶ 133} Additionally, Kastle asked for a new trial under Civ.R. 50(A)(4), which allows new trials on the ground of "[e]xcessive or inadequate damages, appearing to have been given under the influence of passion or prejudice." The reasons given in this regard, again, were lack of any evidence from beneficiaries of non-economic damages and alleged jury confusion because the jury crossed off one amount on an interrogatory

and inserted a different amount.   JNOV Motion at p. 31-32.   In its decision overruling Kastle's JNOV motion, the trial court found no irregularity in the proceedings, no abuse of discretion, and no excessive damages.   JNOV Decision at p. 4.

{¶ 134} "Unlike directed verdicts and judgments notwithstanding the verdict, an order for a new trial does not dispose of litigation; instead, its purpose is to prevent ' "miscarriages of justice which sometimes occur at the hands of juries" ' by presenting the same matter to a new jury."   *Malone v. Courtyard by Marriott L.P.*, 74 Ohio St.3d 440, 448 (1996), quoting *Rohde v. Farmer*, 23 Ohio St.2d 82, 92 (1970).   Trial courts have sound discretion in deciding whether to grant new trials under Civ.R. 59(A)(1).   *Koch v. Rist*, 89 Ohio St.3d 250, 251 (2000).   Our review, therefore, is for abuse of discretion. As noted, most abuses of discretion involve situations where decisions are unsupported by sound reasoning.   *AAAA Ents.,* 50 Ohio St.3d at 161.

{¶ 135} We have already rejected the claim concerning the Release and will not consider it further.   We will begin with the issue of probate court evidence.


A.   Admission of Probate Court Evidence

{¶ 136} Concerning this point, the trial court stated that:

The admission of the Preble County Ohio Probate Court's file was proper and did not constitute an abuse of discretion either. The limited portions of the probate file only served to show the settlement amount and distributions.   The jury could decide on its own the amount it believed the non-economic damages to be, and testimony from Heather Garnett and her

minor children was unnecessary. Glenn Scheuer explained to the jury that he had the opportunity to meet Mrs. Garnett at mediation and that based upon the very young age of the minor children and his impression of Mrs. Garnett, his "coefficient of certainty" led him to believe that there would be "bad damages." Indeed, the jury had the opportunity to see with their own eyes Luke Huggins' and Mr. Scheuer's emotional response on cross-examination the impact Mrs. Garnett made upon them.

JNOV Decision at p. 3-4.

{¶ 137} At trial, Kastle objected to discussion or admission of certified probate records of Preble County as hearsay, and contended, as it had prior to trial, that Westfield needed to bring in Garnett family members to testify about non-economic damages. Tr. at 375-379.

{¶ 138} As indicated, R.C. 2307.25(A) allows a right of contribution to a tortfeasor "who has paid more than that tortfeasor's proportionate share of the common liability" to an injured party. R.C. 2307.25(C) also gives a corresponding subrogation right to insurers who pay more than an insured party's proportionate share of the common liability. Furthermore, R.C. 2307.25(B) states that: "A tortfeasor who enters into a settlement with a claimant is not entitled to contribution from another tortfeasor . . . in respect to any amount paid in a settlement that is in excess of what is reasonable." Therefore, Westfield was required to prove that its settlement did not exceed a reasonable amount. Consistent with this fact, the trial court held before trial that Westfield "must present evidence of both the economic and non-economic damages considered in

reaching its settlement figure." Decision and Entry (June 21, 2022), p. 1.

**{¶ 139}** R.C. 2307.25(B) does not define "reasonable," and the parties have not cited any cases discussing this point. Our research also failed to uncover Ohio cases on this issue. As noted earlier, some jurisdictions have similar uniform contribution statutes. While the law is not extensive on reasonableness, some courts have considered the point. For example, in interpreting Oregon's statute, which is identical in relevant wording to Ohio's, the court of appeals stated that:

> ORS 18.440(3) does not require a contribution plaintiff to prove all of the damages suffered by the underlying plaintiff in order to recover from the contribution defendant. Rather, the focus of the statute is on the reasonableness of the settlement between the contribution plaintiff and the underlying plaintiff. It protects a contribution defendant from having to pay contribution toward a settlement that was in excess of what was reasonable.
>
> Plaintiff's offer of proof included a copy of the Vaneks' complaint against plaintiff and defendant alleging a crop loss of approximately 78 percent and total damages of $87,221.50. The offer of proof also included a copy of the release settling the Vaneks' claims for $60,000. Those documents were sufficient evidence from which a fact finder could conclude that the settlement was reasonable. Plaintiff therefore presented a prima facie case of reasonableness under the contribution statute. The trial court erred in granting defendant's motion to dismiss.

*Jensen v. Alley*, 877 P.2d 108, 111 (Or.App.1994).

{¶ 140} Florida also has a statute like Ohio's and has said that the " 'test as to whether the settlement is reasonable and prudent is what a reasonably prudent person in the position of the defendant would have settled for on the merits of plaintiff's claim.' " *Home Ins. Co. v. Advance Machine Co.*, 443 So.2d 165, 168 (Fla.App.1983), quoting Miller *v. Shugart*, 316 N.W.2d 729, 735 (Minn.1982). The court further noted that "certain objective factors may properly be considered in making that determination, including the extent of the plaintiff's injuries, his past, present and future medical expenses, his age and his ability to work," as well as subjective factors like "the degree of certainty of the tortfeasor's subjection to liability, the risks of going to trial and the chances that a jury verdict may exceed the settlement offer." *Id.* at 168-169, citing *Miller* at 735 and *Stevens v. East-West Towing Company, Inc.*, 470 F.Supp. 484, 488-489 (E.D.La.1979). *See also City of Tucson v. Superior Court In & For Cty. of Pima*, 798 P.2d 374, 380 (Ariz. 1990) (applying essentially the same standards). None of these cases included proof of non-economic damages; what is relevant are the factors an insurer considers in making payment of a particular amount. From that, a decision is made concerning whether the settlement was reasonable.

{¶ 141} Unlike R.C. 2307.25, R.C. 2307.28 imposes a good-faith requirement on a tortfeasor's settlement that does not release other tortfeasors from liability. In that situation, the settlement is offset against a plaintiff's recovery from the other tortfeasors. Again, case authority is sparse, but one court has considered whether there was fraud, collusion, or tortious conduct designed to injure other tortfeasors' interests, whether arms-length negotiation occurred, and whether the settlement was equitable. *Harris v.*

*Alexander Grant & Co.*, 61 Ohio App.3d 172, 182 (10th Dist.1990), interpreting former R.C. 2307.32(F)(1) and (2). The former statute contained the same provisions as the current statute, which is codified as R.C. 2307.28(A) and (B). *Compare* S.B. 108, 2001 Ohio Laws 26 *with* S.B. 120, 2002 Ohio Laws 240, which repealed R.C. 2307.32 and added R.C. 2307.28. *See also Whitney v. Horrigan*, 112 Ohio App.3d 511, 517 (10th Dist.1996) (rejecting appellant's claim that a settlement was not in good faith and noting that "Appellant points to no evidence of possible fraud, collusion or any other wrongful conduct on the part of the settling parties. The settlement was approved by the Court of Claims and the Probate Court of Allen County.").

{¶ 142} In *Cohen v. Univ. of Dayton*, 2005-Ohio-5780 (2d Dist.), we found the trial court had erred in refusing to continue discovery so that a tortfeasor could depose another alleged tortfeasor who had settled with the plaintiff. *Id.* at ¶ 1-2. We commented that "the likely appropriate scope of [the tortfeasor's] deposition would be limited to an analysis of his available resources, including insurance coverage, and the circumstances surrounding the negotiation of the settlement agreement, to the extent that those circumstances might involve fraud or collusion." *Id.* at ¶ 25.

{¶ 143} These latter cases are not precisely on point, since they involve "good faith" rather than reasonableness. However, they do imply that circumstances surrounding negotiation are relevant. They also do not indicate that an insurer must bring in beneficiaries to testify about their grief and loss.

{¶ 144} Furthermore, in contrast to the defendant in *Cohen*, Kastle had ample opportunity to conduct discovery, with no limitations. Kastle extensively deposed

Westfield's claims adjuster and deposed Huggins (an alleged tortfeasor who had settled). There is no evidence that Kastle was precluded from conducting discovery of any other individuals, including the settlement beneficiaries, during the four years this case was pending, or that Kastle even attempted to conduct that type of discovery. Of course, good faith is not an issue here; the only issue is whether the settlement was reasonable.

{¶ 145} The authenticated and certified probate court matters admitted simply recount the approval and distribution of the settlement proceeds in December 2018. *See* Ex. 31. As a preliminary point, we note that Westfield would have been required to submit this evidence to counter Kastle's contention that its contribution claim was barred by the statute of limitations. Although the trial court denied summary judgment on this point, Kastle could have raised it at trial (although it did not). Therefore, it was an appropriate part of the evidence.

{¶ 146} The trial court pretty definitively expressed its belief in its August 2023 summary judgment decision that the statute of limitations had not expired, and that may be why Kastle did not raise the issue at trial. *See* Limitations Decision at p. 7. For that reason, we did not find that Kastle waived the issue by not mentioning it at trial. However, the trial court's decision merely overruled Kastle's summary judgment motion. It therefore was an interlocutory order, meaning Kastle could have chosen to further litigate the matter at trial. *See Stevens v. Ackman*, 91 Ohio St.3d 182, 186 (2001) (generally, denial of summary judgment motion is an interlocutory order); *Huntington Natl. Bank v. Haehn*, 2018-Ohio-4837, ¶ 24 (10th Dist.) (trial court may reconsider interlocutory orders at any time before judgment is entered).

{¶ 147} Kastle cross-examined Scheuer in detail about the settlement at trial and could have raised the matter in a motion for directed verdict at the end of Westfield's case. Consequently, Westfield would have taken a risk if it chose not to include proof of the date when the probate court ruled on the approval and distribution of assets.

{¶ 148} According to Kastle, allowing introduction of the probate documents usurped the jury's function. We disagree. The fact that the probate court approved the settlement, including both economic and not economic damages, was relevant to whether the settlement was reasonable, just as approval was relevant in *Whitney* concerning whether a settlement was made in good faith. *Whitney*, 112 Ohio App.3d at 517. *See also In re Estate of Kenington*, 2003-Ohio-2549, ¶ 8 (noting probate court has duty to ensure wrongful death settlements are fair and equitable).

{¶ 149} Furthermore, Kastle discounts a veritable mountain of evidence supporting the fact that the settlement was reasonable. Witness testimony took place over four days of trial. Scheuer testified over three of those days and extensively discussed the claims process and how he arrived at the decision to pay $6,000,000 to settle the claim. Tr. at 358-427, 432-490, and 496-498. Among other things, Scheuer presented the claim on three different occasions to a roundtable of eight to nine persons within Westfield, each of whom had 20 to 30 years of claims experience. The purpose of the roundtables was to discuss damages, liability, and coverage. *Id.* at 396-397. Scheuer also received information from the insured parties' personal attorneys and counsel that Westfield obtained for the insureds. *Id.* at 367 383.

{¶ 150} In determining damages, Scheuer considered numerous matters,

including: an economist's report from Heather's expert, which demonstrated close to $2,000,000 in economic damages; the fact that under Ohio's wrongful death statute, Garnett's widow, three children, and parents were all entitled to compensation for loss of companionship and society; a coroner's report, which indicated that Garnett had experienced four to six minutes of pain and suffering; and what a jury might do when presented with the evidence. *Id.* at 380-383.

{¶ 151} In addition to Scheuer's testimony, Westfield presented expert testimony from Robert Wessler, who had worked for Allstate Insurance Company for 37 years in various roles, including as a claims adjuster, a supervisor over claims adjusters, a casualty analyst for high value claims, and a regional claims manager. *Id.* at 558-560 and 570. Wessler had worked on Ohio wrongful death claims and described the various elements that are considered as damages under Ohio's statute. *Id.* at 563-567.

{¶ 152} Before testifying, Wessler had reviewed Scheuer's deposition and parts of the claim file, including reports from economists and the coroner. He stated that Scheuer's evaluation of the claim, considering the complexity of the case, was right on point. This included using focus groups, or roundtables, and pulling in an economist. *Id.* at 571-574 and 576. After reviewing the file, Wessler's own evaluation of the claim was eight to twelve million dollars. As to the reasonableness of the settlement, he stated that Westfield's payment was low and was under the claim's value. However, Westfield paid its policy limits and did not have any more to contribute. *Id.* at 590-592 and 594-595. Wessler further said that when high value claims were involved, he would always try to attend mediations with his claims staff to see what the surviving person looked like,

because that has a big impact. In this vein, Wessler stressed that "interpersonal evaluation is just as important as the actual finances and everything else that goes into play as to how this person's going to come across." *Id.* at 607.

**{¶ 153}** Kastle's position about the court records is not persuasive. If Kastle wished jurors to find that Westfield's settlement was not reasonable (which is the real issue), it could have brought in its own expert to challenge Westfield's choice. Instead, it offered no evidence at all. "The jury can accept all, a part or none of the testimony offered by a witness whether it is expert opinion or eyewitness fact, whether it is merely evidential or tends to prove the ultimate fact." *McKay Mach. Co. v. Rodman*, 11 Ohio St.2d 77, 82 (1967).

**{¶ 154}** In its brief, Kastle has relied on R.C. 2125.02 and R.C. 2307.22, stating that Scheuer's impression of Heather failed to meet the requirement of non-economic damages, which are a "wholly separate" element and different from the requirement of reasonableness. Kastle Brief at p. 35. We disagree.

**{¶ 155}** R.C. 2307.22 outlines a method of calculating a joint tortfeasor's proportionate share of both economic and non-economic damages in tort actions. It does not impose a method of establishing damages when an insurer brings an action for contribution. Instead, "[t]he statute provides for the apportionment of fault to others, including persons or entities not present at the time of trial." *Fisher v. Beazer E., Inc.*, 2013-Ohio-5251, ¶ 36 (8th Dist.). This includes tortfeasors who have settled. *Id.* R.C. 2307.23 complements this section by requiring a fact-finder to calculate various percentages of fault attributable to the plaintiff and to the tortfeasors, requiring that the

percentages equal 100 percent. Neither statute mentions damages.

{¶ 156} R.C. 2307.25(B), which applies here, contains two restrictions on settling tortfeasors who seek contribution: (1) the settlement must extinguish the liability of the tortfeasor from whom contribution is sought; and (2) contribution is limited to "any amount paid in a settlement that is in excess of what is reasonable." In turn, R.C. 2307.25(C), which also applies, restricts insurers (who step into the shoes of tortfeasors) in the following ways: (1) the liability insurer must have discharged the tortfeasor's liability in full or in part; (2) the insurer must have discharged the obligation in full by payment; and (3) the insurer is restricted to recovering "the extent of the amount it has paid in excess of the tortfeasor's proportionate share of the common liability." There was no real dispute here about any of these requirements other than whether the settlement was in excess of what was reasonable.

{¶ 157} As to the application of R.C. 2125.02, it states that the surviving spouse, children, and parents of a decedent are all "rebuttably presumed to have suffered damages by reason of the wrongful death." R.C. 2125.02(A). Compensatory damages for wrongful death may include "damages for the following: (1) Loss of support from the reasonably expected earning capacity of the decedent; (2) Loss of services of the decedent; (3) Loss of the society of the decedent, including loss of companionship, consortium, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education, suffered by the surviving spouse, dependent children, parents, or next of kin of the decedent; (4) Loss of prospective inheritance to the decedent's heirs at law at the time of the decedent's death; [and] (5) The mental anguish incurred by the

surviving spouse, dependent children, parents, or next of kin of the decedent." R.C. 2125.02(D).

{¶ 158} The presumption may be rebutted in various ways. For example, a party may establish that a parent has abandoned a minor child and is not entitled to recover damages. *E.g., In re Estate of Marinelli*, 99 Ohio App.3d 372, 378-379 (11th Dist.1994). Other rebuttal could take the form of exploring the parties' relationship or the issue of remarriage, the latter of which is a statutory requirement. *DeVine v. Blanchard Valley Med. Assoc., Inc.*, 103 Ohio Misc.2d 40, 45 (C.P.1999). "Unless and until rebutted by defendants, the plaintiffs are presumed to have suffered damages." *Senig v. Nationwide Mut. Ins. Co.*, 76 Ohio App.3d 565, 571 (10th Dist. 1992).

{¶ 159} The current action was not brought as a wrongful death action. It was brought to recover contribution. The relevance R.C. 2125.02 has here is that Garnett's beneficiaries were statutorily presumed to have suffered damages. Concededly, they did. This presumption, however it might apply, was not rebutted in any way. In fact, Kastle offered no evidence on the matter.

{¶ 160} The trial court instructed the jury on wrongful death damages, the types of damages that could be recovered, and the meaning of economic and non-economic loss. Tr. at 741-744. In addition, the court mentioned the rebuttable presumption that applied to the statutory beneficiaries and stated that, "To the extent Kastle disputes the spouse, children, or parents did not suffer damages as a result of the wrongful death, Kastle has the burden going forward with evidence to rebut that presumption. Westfield has the burden of persuasion as to the amount of damages." *Id.* at 742-743. As noted, Kastle

failed to come forward with any evidence, and Westfield established both the amount of damages (which were not rebutted) and that its settlement was reasonable. Notably, the jury had evidence from which it could have found the amount of damages was eight to 12 million dollars, but it found only six million dollars in damages.

{¶ 161} In light of the above discussion, the trial court did not err in allowing evidence about the probate proceedings.

### B. Observations of the Widow's Likeability

{¶ 162} Kastle also claims it was denied a fair trial due to Scheuer's comment about the fact that Garnett's widow, Heather, was likeable. There is no basis for this assertion, since the testimony elicited at trial indicates that this is simply one of the factors claims adjusters consider when evaluating cases, particularly those that involve large sums of money.

### C. Jury Confusion

{¶ 163} In its post-trial motion, Kastle also raised the presence of grounds for a new trial under Civ.R. 59(A)(4) due to Westfield's failure to provide testimony from the Garnett family and due to alleged jury confusion. We have already rejected the first claim and will consider only the jury issue.

{¶ 164} Under Civ.R. 59(A)(4), a court may grant a new trial based on "[e]xcessive or inadequate damages, appearing to have been given under the influence of 'passion or prejudice.' " "To support a finding of passion or prejudice under Civ.R. 59(A)(4), . . . [the

movant] must demonstrate that 'the jury's assessment of the damages was so overwhelmingly disproportionate as to shock reasonable sensibilities.' . . . In assessing such a claim, a reviewing court should consider the amount of the verdict, whether the jury considered incompetent evidence, improper argument by counsel, or other improper conduct that can be said to have influenced the jury. . .. The granting of a new trial because the verdict is so [inadequate] as to be the result of passion or prejudice rests in the trial court's discretion." *Pytel v. Crenshaw*, 2013-Ohio-3552, ¶ 25 (2d Dist.), quoting *Berge v. Columbus Community Cable Access*, 136 Ohio App.3d 281, 317 (10th Dist. 1999). "The amount of the verdict alone will not sustain a finding of passion or prejudice. There must be something contained in the record which the complaining party can point to that wrongfully inflamed the sensibilities of the jury." *Shoemaker v. Crawford*, 78 Ohio App.3d 53, 65 (10th Dist.1991). Again, we review the trial court judgment for abuse of discretion. *Zerkle v. Kendall*, 2007-Ohio-3432, ¶ 10 (2d. Dist.)

**{¶ 165}** None of the above factors apply here. In reaching a verdict, the jury answered various interrogatories. In the answer to interrogatory three, the jury found Shredders 60% liable and Kastle 40% liable. Tr. at 755. The jury also stated in response to interrogatory four that Westfield's $6,000,000 payment to settle was reasonable. *Id.* Due to confusion over the jury's response to interrogatory six, the court sent the jury back to indicate the numerical amount of economic and non-economic damages. *Id.* at 756-759. When the jury returned, it had inserted economic damages of 1.7 million and non-economic damages of 4.3 million. *Id.* at 759. After some discussion of the general verdict form, the jury members who had signed the verdict form

individually confirmed that they intended to award Westfield $2,400,000 in damages (i.e., .40 times $6,000,000 in economic and non-economic damages equals $2,400,000). *Id.* at 760-761. At that time, the trial court confirmed with counsel that they did not need the jurors polled on any other interrogatories, and the jury was then excused. *Id.* at 761-762. After the jury left, the court asked if counsel had any further motions for the record, and both sides said they did not. *Id.* at 762-763.

**{¶ 166}** In arguing that the new trial motion should have been granted, Kastle focuses on interrogatory six, which had the sum of 10 million crossed out and 4.3 million written above. It also mentions the general verdict, which had two sums crossed out. According to Kastle, this demonstrated that the verdict was unclear and did not demonstrate what the jury intended. Kastle Brief at p. 37. Again, we disagree. When the trial court specifically questioned the jury members about the verdict, they affirmed what they intended, which was that Westfield recover $2,400,000.

**{¶ 167}** Kastle also argues that the jury must have believed it had to award Westfield the amount it paid in settlement because that is the amount of total damages that were awarded (prior to apportionment based on Kastle's 40% share of fault). However, when the trial court sent the jury back to calculate the economic and non-economic damages, it specifically told the jury that: "Since you found damages here and negligence, I'm going to need you to determine, in a numerical amount, what you think the economic damages were and the non-economic damages. Okay? *Even though we settled for $6 million, you have some fact finding in that regard*." (Emphasis added.) Tr. at 759. A presumption always exists that juries follow trial court's instructions. *Pang v.*

*Minch*, 53 Ohio St.3d 186 (1990); *State v. Whitaker*, 2022-Ohio-2840, ¶ 161.   We see no indication the jury failed to do so here.   As noted, there was evidence that the estate's damages could have been valued at between 8 and 12 million dollars.

**{¶ 168}** Nothing in the record indicates the jury was inflamed in any way or that Westfield's counsel engaged in improper argument, and Kastle does not suggest these things.   Kastle does suggest that the jury should not have awarded any damages for survivorship. (The trial court directed a verdict as to survivorship claims of Garnett, because the coroner stated that he could not say with reasonable certainty that Garnett had conscious pain and suffering during the minutes between the time of electrocution and when he died.   Tr. at 515 and 620-621.)   However, the jury was free to award whatever sums it wished.   The interrogatory providing an answer for non-economic damages does not break these damages down into any specific items, and there were several beneficiaries who suffered non-economic damages.   Accordingly, the trial court did not abuse its discretion in overruling Kastle's motion for a new trial.

**{¶ 169}** Based on the preceding discussion, the trial court did not err in denying Kastle's JNOV/new trial motion.   The fifth assignment of error is overruled.

VII.   Manifest Weight

**{¶ 170}** Kastle's sixth and final assignment of error states that:

The Jury's Verdict Is Against the Manifest Weight of the Evidence

{¶ 171} Under this assignment of error, Kastle contends that the trial court judgment was against the manifest weight of the evidence.   In this regard, Kastle again argues that Westfield failed to present evidence that Kastle owed a duty to Garnett on the date of his death and that Westfield's expert failed to demonstrate how Kastle's negligence combined with Kastle's alleged negligence to cause injury.

{¶ 172} In *Eastley v. Volkman*, 2012-Ohio-2179, the Supreme Court of Ohio held that the manifest weight standards outlined in *State v. Thompkins*, 78 Ohio St.3d 380 (1997) should apply to civil cases.   *Id.* at ¶ 17.   Consequently, "[w]hen a [judgment] is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' "   *State v. Hill*, 2013-Ohio-717, ¶ 8, quoting *Thompkins* at 387.   "A judgment should be reversed as being against the manifest weight of the evidence 'only in the exceptional case in which the evidence weighs heavily against the [judgment].' "   *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 173} Moreover, "[b]ecause the factfinder . . . has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility.   The decision whether, and to what extent, to credit the testimony of particular witnesses is

within the peculiar competence of the factfinder, who has seen and heard the witness."

*State v. Lawson*, 1997 WL 476684, *4 (2d Dist. Aug. 22, 1997).

**{¶ 174}** For the reasons previously stated, this is not such an exceptional case, and we find no basis for finding that a miscarriage of justice occurred. Accordingly, the sixth assignment of error is overruled.

## VII.   Conclusion

**{¶ 175}** All of Kastle's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

TUCKER, J. and LEWIS, J., concur.